**Joan M. HARRIMAN et al., Plaintiffs,**

**v.**

**E. I. DU PONT de NEMOURS AND COMPANY, a Delaware Corporation, et al., Defendants.**

**Civ. A. No. 4721.**

United States District Court,
D. Delaware.

Dec. 23, 1975.

See also, D.C., 372 F.Supp. 101.

138

Irving Morris, Joseph A. Rosenthal, Morris & Rosenthal, Wilmington, Del., and Lewis C. Murtaugh, Murtaugh, Nelson & Sweet, Chicago, Ill., for plaintiffs.

Charles E. Welch, and Lawrence C. Ashby, E. I. Du Pont de Nemours & Co., Wilmington, Del., Daniel M. Gribbon, and Cyril V. Smith, Jr., Covington & Burling, Washington, D. C., for defendant E. I. Du Pont de Nemours and Co.

S. Samuel Arsht, Morris, Nichols, Arsht & Tunnell, Wilmington, Del. and Matthew J. Broderick, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant Christiana Securities Co.

Rodman Ward, Jr., Prickett, Ward, Burt & Sanders, Wilmington, Del., for individual defendants.

MURRAY M. SCHWARTZ, District Judge.

The instant case involves a challenge by several shareholders of E. I. Du Pont de Nemours and Company ("Du Pont") to a contemplated merger between Du Pont and Christiana Securities Company ("Christiana"), a closed-end non-diversified management investment company registered under the Investment Company Act of 1940. 15 U.S.C. § 80a–1 et seq. The plaintiffs, suing derivatively on Du Pont's behalf seek, on three grounds, to enjoin the merger. They argue that the proposed merger will, when consummated, violate Delaware law because it is unfair to public shareholders of Du Pont. In addition, plaintiffs urge that the merger is violative of Rule 10b–5,[1] 17 C.F.R. § 240.10b–5 in two respects:[2] first, the defendants have en-

---

1. See note 123, infra.

2. The plaintiffs presented their case in a manner which gives rise to conceptual confusion centering upon which branch of Rule 10b–5 they allege has been violated. This confusion is not a recent development on plaintiffs' part. See Harriman v. E. I. Du Pont de Nemours & Company, 372 F.Supp. 101 (D.Del.1974). Because plaintiffs have spoken interchangeably of both a scheme to defraud and material omissions and misrepresentations, the Court

gaged in a scheme to defraud Du Pont's public shareholders and second, that defendants have made material misstatements and non-disclosures with respect to the merger.

The defendants[3] in this matter, Du Pont, Christiana and various individual directors and officers of Du Pont[4] have countered plaintiffs' claims, maintaining that the merger is fair under both Delaware and federal law and that Rule 10b–5 has not been violated. This matter having come on for trial this opinion will constitute the Court's findings of fact and conclusions of law under Fed.R. Civ.Proc. 52(a). The legal arguments advanced by the parties will be considered below but it is first necessary to fully develop the factual background of the Du Pont-Christiana merger.

## I. FACTS

### A. *The Merger Parties*

Christiana is a closed-end non-diversified management investment company registered with the Securities Exchange Commission under the Investment Company Act of 1940. As of July 17, 1972, the date on which the respective Boards of Directors of Du Pont and Christiana

approved the proposed merger terms, Christiana's portfolio consisted of the following:[5]

Christiana was organized in 1915 as a device both to guarantee the retention of control over Du Pont within the Du Pont family and to ensure that the family's massive Du Pont holdings would be voted as a single unit.[6] Although the original number of such stockholders was quite limited, by 1940 the number of such stockholders had risen in an amount sufficient to trigger the Investment Company Act registration requirement of 100 or more shareholders.[7] However, 75% of Christiana's outstanding securities are held by "affiliated persons"[8] within the meaning of the '40 Act and the Securities Exchange Act of 1934. Moreover, 95.5% of Christiana's common stock is held by 338 persons and the Du Pont family itself still owns, albeit beneficially, three-quarters of the outstanding common stock.[9] Therefore, despite the fact that Christiana's securities are publicly traded in the over-the-counter market it has retained its character as a device for holding the Du Pont family's block of Du Pont common stock.

has chosen to interpret the position of plaintiffs as urging separate violations of Rule 10b–5(1) and 10b–5(2). Accordingly these two claims are considered separately below.

3. Wilmington Trust Company ("WTC") was originally joined as a defendant. Plaintiffs' cause of action as to WTC was dismissed with prejudice as a decision on the merits under Fed.R.Civ.Proc. 41(b) during trial because of plaintiffs' total inability to present any facts which supported their claims against WTC. See Transcript at 602–6.

4. Five of Du Pont's directors were also, at the time of trial, directors of Christiana. In addition ten members of the 1972 Du Pont Board of Directors owned quantities of Christiana's securities.

5. Pre-Trial Order ("PTO") ¶ 11.

| Security | Number of Shares Held | Per Cent of Outstanding Shares |
|---|---|---|
| Du Pont Common | 13,417,120 | 28.3% |
| Du Pont $4.50 Preferred | 16,256 | 1.0 |
| The News-Journal Co. Common Stock | 7,460 | 100.0 |
| Wilmington Trust Co. Common Stock | 69,216 | 3.5 |

6. Joint Exhibit 1 ("Jt. 1") at 3–4.

7. Jt. 1 at 4; Investment Company Act of 1940 § 3(c)(1), 15 U.S.C. § 80a–3(c)(1).

8. Section 2(a)(3) of the Investment Company Act of 1940 defines "affiliated person" as follows: " 'Affiliated person' of another person *means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum of more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof."* 15 U.S.C. § 80a–2(a)(3).

The Securities Exchange Act of 1934 expressly adopts this definition. 15 U.S.C. § 78c(a)(19).

9. Jt. 1. at 5.

Although both Christiana and Du Pont have consistently maintained that in actual fact Du Pont is not controlled by Christiana, the federal securities laws require a different statutory conclusion. By virtue of Christiana's 28.3% holdings of Du Pont's outstanding common stock Christiana is deemed to control Du Pont under Section 2(a)(9) of the Investment Company Act of 1940. 15 U.S.C. § 80a–2(a)(9). Similarly, under the Securities Exchange Act of 1934, Christiana's Du Pont holdings, when added to the fact that the two companies have five common directors, require a presumption of control by Christiana.[10]

Du Pont is far less a stranger to the public eye than its affiliated person[11] Christiana. Its common and preferred stock are traded on the New York Stock Exchange[12] and in 1971, the last full year preceding the merger negotiations, Du Pont had a net income of $356,500,-000 on net sales of approximately 3.85 billion dollars.[13] This produced earnings per share of $7.33 of which $5.00 per share was distributed to shareholders in the form of dividends.

### B. Market History of Christiana and Du Pont

Although a share of Christiana is, in essence, a share of Du Pont because over 98% of Christiana's investment portfolio is Du Pont common, see, In the Matter of Christiana Securities Company—E. I. Du Pont de Nemours and Company at 9, Investment Company Act of 1940 Rel. No. 8615 (12/13/74),[14] Christiana common has generally traded at a substantial discount from its net asset value.[15] Over the two years preceding the April 28, 1972 announcement that merger negotiations were to be undertaken by Du Pont and Christiana, Christiana common generally sold at a discount from net asset value ranging between 20 and 25%.[16]

**10.** PTO ¶ 15; Ex. D–4 at 1.

**11.** Under the Investment Company Act and the '34 Act Christiana and Du Pont are affiliated persons. See note 8, *supra.*

**12.** PTO ¶ 17.

**13.** PTO ¶ 13.

**14.** This document, the SEC's opinion on the Christiana-Du Pont exemption under Section 17(b) of the Investment Company Act of 1940, was admitted to the record of this action as Joint Exhibit 1 ("Jt. 1"). When employed as a source of purely factual material it will be cited as Jt. 1. When cited as authority for a legal conclusion or an inference drawn from the facts presented in the record before them, the entire content of which has also been submitted as an exhibit here, it will be described by its formal title.

**15.** The net asset value of an investment company is based upon the "value" assigned to securities or other property held by the company. "Value" is generally defined, in the case of securities "for which market quotations are readily available" as the market value of such securities. Investment Company Act of 1940, § 2(a)(41)(B), 15 U.S.C. § 80a–2(a)(41)(B).

**16.** The market prices of Du Pont common and Christiana common and 7% cumulative non-voting preferred between January 1, 1970 and September 30, 1972 were as follows:

| | Du Pont Common Stock | |
|---|---|---|
| **1970:** | **High** | **Low** |
| 1st Quarter | $ 108.75 | $ 92.50 |
| 2nd Quarter | 121.50 | 97.13 |
| 3rd Quarter | 128.00 | 111.00 |
| 4th Quarter | 134.25 | 114.00 |
| **1971:** | | |
| 1st Quarter | 148.00 | 129.50 |
| 2nd Quarter | 152.00 | 134.75 |
| 3rd Quarter | 158.00 | 139.50 |
| 4th Quarter | 157.25 | 133.38 |
| **1972:** | | |
| 1st Quarter | 175.50 | 144.25 |
| 2nd Quarter | 176.50 | 159.13 |
| 3rd Quarter | 184.38 | 160.00 |
| **Closing Prices:** | | |
| April 28, 1972 (a) | $168.25 | |
| July 17, 1972 (b) | 164.50 | |

The discount is probably attributable to two significant factors. First, all dividend income received by Christiana as a result of its ownership of Du Pont common is subject to federal corporate income tax. The effective rate at which such dividend income is taxed is 7.2%.[17] Thus, were Christiana removed as an intermediary between Du Pont and the current Christiana stockholders, the gross amount of dividends distributed directly to those shareholders would be increased by 7.2%. Secondly, Christiana common, which is traded over-the-counter in a fairly thin market,[18] is relatively illiquid compared to the trading volume of Du Pont common. *See, In the Matter of Christiana Securities, supra* at 22, n. 51. The thinness of the market for Christiana despite the fact that some 11,710,103 shares of Christiana are currently issued and outstanding[19] seems attributable to two other phenomena: the extremely low or, in some cases, zero, tax basis[20] of individual holders of Christia-

| | Christiana Common Stock | | | | Christiana Preferred Stock | | | |
| | Bid | | Asked | | Bid | | Asked | |
| | High | Low | High | Low | High | Low | High | Low |
| **1970:** | | | | | | | | |
| 1st Quarter | $ 99.00 | 85.00 | 103.00 | 88.00 | 99.00 | 94.00 | 103.00 | 97.00 |
| 2nd Quarter | 107.00 | 90.00 | 109.00 | 93.00 | 99.00 | 88.00 | 104.00 | 91.00 |
| 3rd Quarter | 112.00 | 100.00 | 115.00 | 103.00 | 96.00 | 88.00 | 100.00 | 91.00 |
| 4th Quarter | 113.00 | 101.00 | 117.00 | 104.00 | 99.00 | 95.00 | 102.00 | 98.00 |
| **1971:** | | | | | | | | |
| 1st Quarter | 129.50 | 112.00 | 131.00 | 114.00 | 106.00 | 97.00 | 109.00 | 100.00 |
| 2nd Quarter | 129.00 | 120.00 | 138.00 | 123.00 | 106.00 | 95.00 | 110.00 | 99.00 |
| 3rd Quarter | 141.50 | 122.50 | 143.50 | 124.50 | 100.00 | 94.00 | 105.00 | 100.00 |
| 4th Quarter | 136.00 | 116.00 | 138.00 | 118.00 | 100.00 | 97.00 | 104.00 | 102.00 |
| **1972:** | | | | | | | | |
| 1st Quarter | 142.00 | 120.00 | 145.00 | 123.00 | 99.00 | 98.00 | 104.00 | 101.25 |
| 2nd Quarter | 166.50 | 140.00 | 173.00 | 143.00 | 102.00 | 97.00 | 106.00 | 102.00 |
| 3rd Quarter | 195.50 | 160.00 | 205.50 | 165.50 | 106.00 | 100.00 | none | none |
| **Closing bid price** | | | | | | | | |
| April 28 (a) | | 147.00 | | | | 100.00 | | |
| July 17 (b) | | 167.50 | | | | 100.00 | | |

(a) Announcement was made on this date, after the close of trading on the New York Stock Exchange, that merger discussions would be undertaken.

(b) On this date, the proposed merger was approved in principle by the Boards of Directors of Du Pont and Christiana and the merger terms were publicly announced after the close of trading on the New York Stock Exchange.

PTO ¶ 17.

---

17. In general corporate income is federally taxed at a 48% rate. Section 11, Int.Rev. Code, 26 U.S.C. § 11. However, all corporations, be they investment companies or not, are allowed to deduct 85% of any dividends received from their taxable income. Section 243, Int.Rev.Code, 26 U.S.C. § 243. Therefore, the effective tax rate applied to intercorporate dividend income is 48% of 15%, or 7.2%.

18. Between January 3, 1972 and January 8, 1973 there were only 24 days on which the over-the-counter trading volume of Christiana exceeded 2500 shares. By contrast, the daily trading volume of Du Pont common during the same period exceeded 20,000 shares 49 times. *See* Plaintiffs' Exhibit 58 ("PX–58"). In the eight weeks preceding announcement of the merger daily trading volume in Du Pont common averaged between 10,000 and 36,000 shares, while trading volume in Christiana ranged between 300 and 1900 shares a day. DX–10 at 6.

19. The authorized and outstanding capital stock of Christiana as of July 17, 1972 was as follows:

1. 7% cumulative, non-voting preferred stock ($100 par value) (callable at $120 per share) authorized, issued and outstanding ........................ 106,500

2. Common stock ($1.25 par value)—authorized 13,600,000 shares; issued and outstanding .................. 11,710,103

PTO ¶ 12.

20. The low bases are generally attributable to the low prices at which Christiana was originally purchased, either by its current holders or their donors. Further, over 25% of the outstanding Christiana shares have a zero basis. This was caused by reducing the tax basis of those Christiana shareholders who received

na which means that sales of Christiana would trigger huge capital gains tax liabilities on the part of selling shareholders and the historical control purpose of Christiana, a goal that would be ill-served by sales of stock belonging to Christiana's control group.

Other less significant factors may also have had some effect upon the rate at which the market has chosen to discount Christiana's net asset value. Christiana obviously costs something to operate and while it has consistently followed a practice of declaring dividends on its common stock in an amount nearly equal to its *net* earnings per share,[21] whatever minimal[22] operating expenses are incurred must be accounted for by further reducing Christiana's gross after-tax dividend income. Moreover, Christiana's historical procedure of distributing virtually all of its dividend income to its shareholders is not writ in stone and thus a further part of the market's discount from net asset value may be attributable to the risk that Christiana one day might seek to retain some of its dividend income. Finally, it should be noted that the closed-end discount phenomenon is neither a recent development[23] nor applicable solely to Christiana.[24]

## C. *Merger Negotiations*

Merger negotiations between Du Pont and Christiana were initiated in late April of 1972 when Christiana's President, Irenée du Pont, Jr., sent a letter dated April 20, 1972, to C. B. McCoy ("McCoy"), then President and Board Chairman of Du Pont, suggesting that a merger between the two entities would be advantageous to both parties.[25] As a result Du Pont agreed to consider such a merger.

Prior to the start of negotiations the Christiana and Du Pont boards took two basic steps prompted by the extremely close historical relationship and interlocking directorates of the two companies:[26] The appointment of special negotiating committees composed of persons unconnected with the opposing negotiating party and the retention of three investment banking firms to provide financial advice with respect to valuations to be employed during negotiations and the fairness of any proposed merger terms.

The Du Pont board named McCoy and Irving S. Shapiro ("Shapiro"), then Senior Vice-President[27] and a Director of Du Pont as its negotiating committee. Christiana similarly designated a two-man board composed of A. Felix du Pont, Jr., a Christiana Vice-President and Director, and E. B. du Pont, its Assistant Treasurer and also a Director. Du Pont and Christiana jointly retained Morgan Stanley & Co. ("Morgan Stanley"), an investment banking firm, as a financial advisor in connection with the merger. Morgan Stanley had previously assisted both of the merger parties.[28] Christiana and Du Pont each then retained separate financial advisors, choosing Kidder, Peabody & Co., Incorporated ("Kidder Peabody") and the First Boston Corporation ("First Boston") respective-

---

distributions of Du Pont-held General Motors stock pursuant to an antitrust divestiture decree. *See, United States v. E. I. Du Pont de Nemours & Co.*, 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 518 (1961). Jt. 1 at 10, n. 31 and 12, n. 35.

**21.** D–4 at 4.

**22.** *Id.*

**23.** At the time Congress approved the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.*, the closed-end discount phenomenon was well known. In the Matter of Christiana Securities Company, I.C.A. Rel. No. 8015 (12/13/74).

**24.** *See, e. g.*, Delaware Realty & Investment Company, 40 S.E.C. 469, 470–1 (1963); Harbor Plywood Corporation, 40 S.E.C. 1002, 1010 (1962). *Cf.* Townsend Corporation of America, CCH Fed.Sec.Law Rep. ¶ 77,120 at 82,070 (1964) [1964 Transfer Binder].

**25.** PTO ¶ 29; DX–13.

**26.** See note 4, *supra*.

**27.** Mr. Shapiro is currently Du Pont's Chairman of the Board.

**28.** Trans. 145–9; DX–10.

ly.[29] Neither Kidder Peabody nor First Boston had any prior significant relationship with either of the merger parties.[30]

The three financial advisors were asked to prepare reports for the special negotiating committees providing a financial analysis and evaluation of all factors believed relevant to the transaction.[31] Moreover, they were requested to make recommendations as to a range of exchange ratios of Du Pont and Christiana common they considered to be fair, reasonable and consistent with the statutory standards rendered applicable by the Investment Company Act of 1940.[32]

All three investment advisors considered the relative advantages and disadvantages of a merger to both parties and concluded that a merger involving exchange ratios within a certain range would provide advantages to both parties.[33] Further, the investment advisors adopted the view that the proposed transaction essentially involved an exchange of Du Pont stock for Du Pont stock,[34] placing emphasis both upon the extremely heavy weighting of Christiana's portfolio towards Du Pont common, as well as the historical purposes of Christiana.

Despite the fact that Christiana had usually traded at a substantial discount from its underlying net asset value, neither Du Pont's financial advisor nor Morgan-Stanley assigned any weight to that factor in calculating their recommended exchange ratios.[35] Moreover, all three financial advisors took the position that market value was irrelevant when considering the merger of a non-diversified closed-end investment company into its operating affiliate.[36] As an alternative to market value, Morgan Stanley and Kidder Peabody each employed Christiana's net asset value[37] as a device for assigning a valuation to Christiana in order to determine an appropriate range of potential exchange ratios.[38] First Boston did not utilize net asset value, but instead approached the transaction from an earnings per share perspective.[39] However, First Boston's recommendations with respect to exchange ratios that would result in increments to Du Pont's per share earnings were readily transformable into net asset value terms.[40]

In late June of 1972 the three financial advisors prepared reports advising their respective clients on the range[41] of exchange ratios they deemed fair, as well as articulating the bases both for their conclusions and their modes of analyzing the prospective transaction. On the evening of June 29, 1972[42] First Bos-

---

29. DX–2; DX–5.

30. Trans. 374–5; 577–78.

31. DX–2; DX–25.

32. DX–2; DX–5; DX–17.

33. *See*, PX–41; PX–34; PX–40.

34. PX–40; T–175–6, 190, 398, 405.

35. T–182–5; DX–25 at 4; T–404–5.

36. DX–3; DX–6; DX–10.

37. *See* note 15 *supra*.

38. DX–38; DX–6 at 17–26; DX–10; PX–41.

39. See generally DX–3; PX–34; T–392–5.

40. T–429. One factor that must be noted is that First Boston not only employed a slightly different starting figure in calculating Christiana's net asset value, but they did not make any adjustments to that figure unlike their fellow financial advisors. T–423, 548; *Compare* Addendum to DX–3 *with* DX–10. The effect of these varied calculations was that the same exchange ratio would translate, using First Boston's figures, into a higher discount than that recommended by Morgan Stanley or agreed upon by the two negotiating committees. For example, the same exchange ratio (1:1.1225) produced a discount from net asset value under Morgan Stanley's or the negotiating committees' formulae of 2.5% while First Boston treated that ratio as producing a 2.9% discount from net asset value. *See Id.* This differential is attributable *solely* to the fact that First Boston utilized an unadjusted net asset value figure.

41. See notes 45 and 46 *infra*.

42. There had been meetings between the Du Pont representatives and their financial advisors prior to this meeting. None of these can be considered of much significance with respect to the legal claims at issue here and may

144

ton met with Du Pont's special negotiating committee and discussed the issues covered in its report. The following morning both negotiating committees met jointly with all three financial advisors in order to more fully develop their understanding of the advisors' recommendations and conclusions with respect to the proposed merger.[43]

In the reports proffered up to this point by the financial advisors they posed the following recommended merger terms: Kidder Peabody (Christiana's advisor)—an exchange of Du Pont shares valued at market equal to Christiana's adjusted net asset value[44] or a range covering a 1.7% premium over Christiana's net asset value to a 1.7% discount from the adjusted net asset value;[45] Morgan Stanley—a range of discounts from Christiana's adjusted net asset value of .5% to 2.0%;[46] First Boston—a range of exchange terms resulting in a 2¢ to 8¢ increase in the pro forma earnings per share of Du Pont common which translates into adjusted net asset value terms as a 1.5% to 3.8% discount.[47]

The range of merger terms initially recommended by Morgan Stanley and Kidder Peabody was heavily influenced by the theoretical availability of a "one-month" liquidation under Section 333 of the Internal Revenue Code, 26 U.S.C. § 333, as a supposedly viable alternative to the proposed merger for Christiana in which Christiana's shareholders could realize a return approximating a small discount from net asset value and thereby similarly eliminate much of the market value disparity attaching to Christiana common. Under such a liquidation Christiana could, assuming an election by 80% of its corporate and non-corporate shareholders, liquidate and distribute its assets directly to its stockholders within any one calendar month. 26 U.S.C. § 333(a)(2). The sole costs involved in this method, aside from the relatively minor transaction costs attaching to procedural steps, would be that the shareholders receiving the distributed assets would be taxed on their pro rata shares of Christiana's accumulated earnings and profits. 26 U.S.C. § 333(e) and (f). The main benefit of this procedure from the viewpoint of Christiana's shareholders is that it would have achieved the same end result of the merger, namely distributing Du Pont common directly to them at a relatively minimal cost.

The availability of the Section 333 alternative was apparently initially suggested by Du Pont in an interdepartmental memorandum drafted on May 12, 1972.[48] This memo indicated that the probable tax costs of a Section 333 liquidation would fall somewhere between 40 and 68 million dollars. Subsequently, Christiana's counsel prepared a document estimating the minimum and maximum tax costs as $38 million and $85.8 million respectively.[49] As a result of these documents, copies of which were provided to all the financial advisors, Kidder Peabody and Morgan Stanley approached their evaluation of the proposed merger with the assumption that Christiana had another method of achieving its desired result. Both of these two advisors uti-

---

simply be characterized as highly tentative working sessions, when compared to the June 29th meeting which was clearly to be employed by the Du Pont committee at the forthcoming negotiations.

**43.** T–166.

**44.** DX–38 at 1.

**45.** In its initial report dated June 30, 1972 Kidder Peabody only recommended an exchange of Du Pont common equal in value to the non-discounted adjusted net asset value of Christiana. When pressed at the June 30th meeting to comply with their assignment by providing a range of merger terms, Kidder Peabody pro-

vided the 1.7% premium to 1.7% discount range. T–584–90.

**46.** PX–41 at 21–2. Although Morgan Stanley recommended discounts from adjusted net asset value in a range of .5% to 2.0%, it also recognized that a range of terms covering no discount up to a 2.84% discount was sufficiently plausible to serve as a spectrum within which negotiations would be conducted. *Id.*

**47.** PX–34; T–548.

**48.** DX–17.

**49.** DX–27.

lized the estimated costs of a Section 333 liquidation and translated these tax costs into net asset value discount terms. Kidder Peabody employed a discount from net asset value of 1.7% as the cost of a Section 333 liquidation and therefore set that figure as a negotiated discount ceiling.[50] Morgan Stanley, utilizing a somewhat different set of figures calculated the discount as 2.84% and indicated the significance of that figure in determining a proper range within which negotiations could properly be conducted.[51] In contrast, First Boston gave no effect to the supposed existence of a Section 333 liquidation alternative in deriving their recommended range of terms.[52]

Almost immediately at the outset of formal negotiations the Section 333 liquidation ceased to exist as a viable alternative for Christiana. During the weekend following the June 30th meeting of both special committees and their financial advisors, counsel for both negotiating parties met and discussed the applicability of Section 333 to Christiana. Despite the fact that the earliest *documentary* suggestion[53] of Section 333's utility to Christiana came from Du Pont, the Du Pont negotiators considered it to be merely a tactical ploy on the part of their Christiana counterparts.[54] The principal factors in this belief were the impracticality of getting the required rapid consent from Christiana's nearly 8,000 shareholders and, more importantly, the significant difficulties that existed in accurately calculating Christiana's accumulated earnings and profits,[55] since the inability to determine those accumulated earnings and profits precluded making any reliable estimate of the tax costs and therefore made it impractical to seek the necessary authorization to proceed from Christiana shareholders.

Christiana and its various representatives proved unable to counter the Du Pont beliefs on this issue by developing any reliable estimates of the accumulated earnings and profits. As a result, Christiana was forced to admit that a liquidation alternative simply did not exist.

Although Christiana's negotiating committees did not formally concede the demise of Section 333 until the first negotiating session on July 3rd, *both* parties notified their respective financial advisors that it had ceased to exist on Sunday, July 2nd.[56] Morgan Stanley indicated to Du Pont that its recommended maximum range would have to be increased in light of this development, but that the change would be relatively small.[57] First Boston however, opined that the removal of Section 333 would have no effect whatsoever on its previously recommended range of acceptable merger terms.[58]

By Sunday the 2nd the Du Pont negotiators were contemplating merger terms involving a 2 to 2½% discount from Christiana's adjusted net asset value.[59] Three factors were important in arriving at this negotiating posture. First, they believed some inducement was necessary in order to gain the requisite Du Pont shareholder approval. Since no weight was being attached by that date to the Section 333 alternative they were freed from any constraints occurring by virtue of the initial Morgan Stanley maximum discount recommendation of 2.0%.[60] Second, despite the fact that their other financial advisor, First Boston, had submitted a range encompassing a discount of up to 3.8% the negotiators and their advisors had been unable to discover any prior mergers of either a regulated or

---

**50.** DX–38.

**51.** PX–41 at 20, 21–2.

**52.** T–432, 512–9, 533. See text *infra* at 24–5.

**53.** The earliest mention of the Section 333 issue appears to have been on April 28, 1972 by Christiana's counsel. T–915.

**54.** T–918.

**55.** T–915–6.

**56.** T–173; T–431–3; T–587.

**57.** T–173.

**58.** T–432.

**59.** T–817.

**60.** T–818, 829.

unregulated investment company which involved a discount from net asset value exceeding 1.8%.[61] Finally, the necessity of formal SEC approval,[62] when combined with the negotiators' belief that Christiana would agree to a discount no higher than 2.5%,[63] augered heavily in favor of their chosen negotiation posture.

At the first negotiating session on July 3rd Christiana formally conceded that a Section 333 liquidation was not a viable alternative following a challenge by Mr. Shapiro on this issue.[64] Thereafter, the Du Pont negotiators kept pushing, despite formidable opposition on Christiana's part, for a discount from adjusted net asset value of 2½%. The basic Christiana position, at this juncture, was for merger terms recognizing Christiana's full adjusted net asset value,[65] and as a result, this initial negotiating session concluded without any agreement.

The demise of the Section 333 alternative gave the Du Pont negotiators what they believed to be a significant bargaining advantage.[66] Although the financial advisors' reports had, at least in the case of Morgan Stanley and Kidder Peabody, relied upon that possibility in fixing their respective recommendations, the Du Pont negotiators felt that there was no need to suspend formal negotiations until additional *written* recommendations could be submitted. The primary foundation for this belief was the knowledge that the range which they had settled upon as a negotiating posture was clearly within First Boston's recommendations, a set of terms which they were

advised would be unaffected by the changed circumstances and only slightly higher than Morgan Stanley's, who had indicated their maximum discount level would be slightly increased. This belief combined with the fact that the Du Pont committee thought delaying negotiations would destroy any bargaining leverage they might then have over Christiana by virtue of the demise of one of their opponent's strongest counterarguments.

The assessment of their tactical position appears, at least from the Court's current perspective some three years afterwards, to have been correct. On the morning of the second negotiating session, July 6, 1972, the Christiana special committee met with the non-Du Pont Christiana directors and representatives of Kidder Peabody to seek their advice on Du Pont's demand for a 2½% discount[67] and were advised that such a discount was acceptable.[68] Later that day, after making more efforts to minimize the extent of the discount sought by Du Pont,[69] Christiana agreed in principle[70] to a merger employing a 2½% discount from Christiana's adjusted net asset value.[71]

The three financial advisors were contacted that afternoon to determine whether the agreed terms were consistent with their respective views on fairness in the proposed transaction. First Boston had already prepared, but not distributed, a finalized report[72] dated July 6, 1972, recommending a range of exchange ratios from 1.108 to 1.139 shares of Du Pont common for each share, which, when translated into net asset value terms, covered a discount

**61.** T–821, 829.

**62.** T–821, 893.

**63.** The basis of this belief, at least in part, was the fact that Christiana had years before "walked away" from a similar merger in the belief that they would be forced to give up too much.

**64.** T–828–9.

**65.** T–773.

**66.** T–950, 958–9.

**67.** T–773–5.

**68.** T–775.

**69.** T–776.

**70.** The July 6, 1972 agreement was of course subject to approval by the Boards of Directors of the two companies.

**71.** PX–25.

**72.** DX–3.

range from 1.5 to 3.8%.[73] Only two rather minor changes had occurred from their earlier reports. First, both proffered ratios had increased by four-thousandths (.004) of a point. However, this change had nothing whatsoever to do with the elimination of the Section 333 alternative but was instead due to changes in their method of calculating Du Pont's rate of return on cash, and assets to be converted into cash, acquired in the merger.[74] Secondly, the explanatory charts accompanying the report no longer included a column calculating liquidation values of Christiana's assets. This change, which was attributable to Section 333's disappearance, cannot be considered significant. The First Boston approach and lack of weight assigned to the supposed existence of the liquidation alternative, as well as the lack of effect on the recommended terms of its demise, are sufficient to support a more than fair inference that the original inclusion of the liquidation column was no more than a courtesy induced by the attention their client initially drew to section 333.[75]

Similarly, Morgan Stanley had already decided by the 5th of July that the upper limit of their recommended range of terms should be increased to include a discount of 2.5% from adjusted net asset value,[76] but had not yet communicated that advice to either set of negotiators. As a result they were, when contacted, able to inform representatives of both negotiating parties that the agreed terms were consistent with the Morgan Stanley view of the transaction.[77] Finally, Kidder Peabody had already indicated earlier that day that 2.5% would be acceptable in their opinion.[78].

On the following day, all three financial advisors submitted updated versions of their reports. Their respective recommendations were as follows: Morgan Stanley, .5 to 2.5% discount from adjusted net asset value;[79] Kidder Peabody, 2.0% premium over, to 3.0% discount from adjusted net asset value;[80] and First Boston which recommended exchange ratios translating into a 1.5 to 3.8% discount from adjusted net asset value.[81]

### D. Merger Terms

Central to comprehension of the merger terms involving an exchange of Du Pont common for Christiana common which would recognize a 2½% discount from Christiana's adjusted net asset value is an understanding of how that net asset value was developed and what adjustments were made to it. The negotiating committees first assigned values to each of the items in Christiana's securities portfolio.[82] With respect to the 13,417,120 shares of Du Pont common and 16,256 shares of Du Pont $4.50 preferred, valuation was fairly simple. Since both classes of stock are traded on the New York Stock Exchange the negotiators merely multiplied the number of shares held by the average daily closing price during the week preceding the July 17, 1972 public announcement of the

73. See note 40, *supra*.

74. DX–71.

75. T–533.

76. T–174.

77. T–174–5.

78. T–589–93.

79. DX–10; DX–11.

80. DX–6. The final upper range of Kidder Peabody is without explanation in the record. On the morning of July 6, 1972 Kidder Peabody had agreed that a 2.5% discount from net asset value would be fair but it also reaffirmed its belief that, from Christiana's viewpoint, the transaction could best be carried out

with an exchange ratio that recognized Christiana's entire net asset value. Since the only change between the 6th and 7th of July was the agreement to merge, the Court concludes that motivations other than considered financial judgment resulted in the final range suggested by Kidder Peabody.

81. DX–3.

82. See note 5, *supra* and accompanying text. For negotiation purposes closing market values on May 31, 1972 were used. After the 2½% discount was negotiated the parties agreed to use average market prices during the week preceding announcement of the merger for portfolio valuation purposes. See PTO ¶ 19.

merger.[83] The value assigned to the Wilmington Trust stock was similarly calculated by utilizing the average daily closing bid price in the over-the-counter ("OTC") trading market during the same time period.

The valuation process for the News-Journal Co. common stock was far more complex. The merger parties jointly retained Vincent Manno, a leading newspaper broker and recognized authority on the valuation of privately-held newspapers to appraise the News-Journal Company.[84] Utilizing the News-Journal's financial statements for the years 1967 through 1971 and unaudited figures for the first 16 weeks of 1972, as well as trade information generally available in the Wilmington area, Mr. Manno arrived at a valuation exclusive of net quick assets of $23,000,000 for the News-Journal. Mr. Manno considered the gross revenues, expenses and circulation of the two newspapers published by the News-Journal Company in his appraisal and took account of the fact that the News-Journal published the only daily newspapers in the Wilmington area. The $23 million valuation was the product of four separate calculations involving multiples of gross revenues and projected net earnings.[85] The actual earnings during the period examined by Mr. Manno were lower than the estimated earnings he believed could be achieved. However, Mr. Manno concluded that a prospective purchaser would emphasize the potential, rather than actual, earnings and revenues of the News-Journal, particularly in view of operating inefficiencies he deemed readily remediable and the exclusive nature of its newspaper market coverage.[86] Finally, as is customary in the valuation of newspapers, the value of the News-Journal's net quick assets

was added to the $23,000,000 figure, producing an appraised value of $24,260,000.[87]

Manno's appraisal was initially a source of surprise to the negotiators. By contrast, in an internal Du Pont memorandum, a value of only $6,800,000, had been assigned to the News-Journal.[88] However, this figure was based on approximations of the book value of the News-Journal's net assets, a mode of appraisal bearing little, if any, relationship to the fair market value of those assets.[89] Moreover, this estimate took no account of the News-Journal earnings or the inefficiencies in the areas of circulation, advertising and labor relations,[90] which render it more than plausible to discard the actual earnings as a basis for calculation of an appraised value. Therefore, in order to satisfy themselves as to the soundness of the Manno appraisal, all three financial advisors and representatives of Du Pont and Christiana met with Mr. Manno on June 27, 1972 and questioned him extensively as to the basis for, and derivation of, his valuation of the News-Journal.

The above steps resulted in the following values being assigned to the Christiana securities portfolio:

| | |
|---|---|
| Du Pont Common | $2,198,730,540 [91] |
| Du Pont $4.50 Preferred | 1,124,102 [92] |
| The News-Journal | 24,260,000 |
| Wilmington Trust Co. Common | 2,699,424 [93] |
| Total | $2,226,814,066 |

The total net asset value of Christiana was then developed by adding the cash and cash equivalents held by Christiana minus its current liabilities. This produced the following calculation:

| | |
|---|---|
| Christiana Securities portfolio | $2,226,814,066 |
| Other assets | 5,981,367 |
| Total net asset value | $2,232,795,433 |

83. PTO ¶ 19; DX–4.

84. PX–61.

85. T–669–74.

86. T–656–8; 660–75, 679.

87. PX–62; T–675–6.

88. DX–17 at 2.

89. *Id.*

90. T–656–8; 660–75, 721–2.

91. Based on 13,417,120 shares at $163.875 per share.

92. Based on 16,256 shares at $69.15 per share.

93. Based on 69,216 shares at $39.00 per share.

Various adjustments to net asset value were then made to reflect expenses of the merger and other items. These adjustments and their effect upon Christiana's net asset value is as follows:

Total Net Asset Value of
Christiana . . . . . . . . . . . . . . . . . . . . $2,232,795,433
 *Less*: Estimated expenses
 and taxes upon disposal
 of the News-Journal Co.
 and Wilmington Trust
 Stock [94] . . . . . . . . . . . . . . . . . . (7,619,606)
 Christiana's share of
 merger expenses [95] . . . . . . . . . ( 750,000)
 Litigation expenses for
 Christiana tax claim [96] . . . . . . . (1,000,000)
Adjusted Net Asset Value of
Christiana . . . . . . . . . . . . . . . . . . . . $2,223,425,827

The negotiated discount of 2½% from Christiana's adjusted net asset value resulted in a further reduction of that figure to $2,167,840,181.[97] An additional $12,780,000 reflecting the value of Christiana's assets attributable to 106,500 shares of its preferred stock at $120 a share [98] was subtracted from that figure resulting in a value of $2,155,060,181 attributable to Christiana's common stock. The exchange ratio was then calculated by developing the number of shares of

Du Pont common, valued at $163.875, equal in value to Christiana's remaining adjusted net asset value. The resulting figure of 13,150,634 shares of Du Pont common when divided by the outstanding 11,710,103 Christiana common shares produces the exchange ratio of 1:123 shares of Du Pont common for each share of Christiana common.[99]

The Christiana 7% preferred stock was treated quite differently, having been totally excepted from the development of the exchange ratio attaching to the two common stocks.[100] Christiana's Certificate of Incorporation provides that any redemption of this stock should occur at $120 per share. Further, counsel to the financial advisors opined that in any appraisal proceedings brought by a preferred stockholder of Christiana dissenting from the merger a Delaware court would utilize the $120 figure in awarding appropriate compensation to a dissenter. Accordingly, all three advisors indicated that the proper treatment of the 7% preferred stockholders was to exchange $120 worth of Du Pont common for each share of Christiana 7% pre-

---

94. A 30% tax rate on long term capital gains was assumed as well as expenses of 3% of market value in connection with disposal of the Wilmington Trust stock. PTO ¶ 20; DX–4 at 13.

95. Merger expenses were estimated at $1.5 million. Both merger parties were to share this burden equally. PTO ¶ 21. DX–4 at 13.

96. As of July 17, 1972 one of Christiana's assets was a pending tax claim of $11,723,013 which was carried on Christiana's books as a deferred charge. Since the merger parties were unable to determine the fair value of the tax claim, it was treated as having no value for purposes of the merger. In addition $1 million in cash was reserved to cover expenses of litigating this claim. PTO ¶ 22. As a result provision was made in the merger agreement in the event that settlement of the tax claim preceded the effective date of the merger for a contingent pro rata distribution of shares of Du Pont common in an amount equal to any recovery on the tax claim divided by $163.875, the average daily closing price of Du Pont common during the week preceding public announcement of the merger. Since the tax claim has now been settled and the market price of Du Pont common is far lower at

present than $163.87, Du Pont will, if the merger is finally consummated, have a further gain in connection with the merger of an amount corresponding to the difference between the then current market price and $163.87 times the number of shares required to be issued pro rata to satisfy the tax claim settlement.

Similarly, less than half of the monies reserved to cover expenses of litigating the tax claim were spent and thus an additional incremental gain will flow to Du Pont. Because these circumstances result solely from the serendipitous convergence of merger-delaying litigation and unpredictable market movement, the Court has not considered this factor in assessing the fairness of the merger. The market place, which is far less concerned with the application of legal standards than with economic realities, will take account of these fortuitous circumstances.

97. The actual dollar amount of the discount is $55,585,646.

98. See note 100, *infra* and accompanying text.

99. PTO ¶ 27; DX–4 at 6–7; DX–15, Ex. A at 15.

100. See text accompanying note 97, *supra*.

ferred and no challenge to this contemplated distribution has been raised by plaintiffs.

The respective boards of directors approved the merger terms in principle on July 17, 1972. Thereafter both boards executed an Agreement and Plan of Reorganization ("Agreement") on December 20, 1972.[101] The Agreement established several pre-conditions to consummation of the merger including approval by the shareholders of both parties, the receipt of a favorable tax ruling treating the merger as a non-taxable event and the granting of an exemption [102] by the SEC under section 17(b) of the Investment Company Act of 1940 on the statutory ground that the terms of the proposed transaction " * * * are reasonable and fair and do not involve overreaching on the part of any person concerned." 15 U.S.C. § 80a–17(b)(1). The SEC exemption was granted, following trial before an administrative law judge and consideration by the SEC Commissioners on December 13, 1974.[103] The tax ruling has not yet issued.[104] The third relevant pre-condition of shareholder approval has not yet occurred since the merger parties chose to forego submitting the merger for a stockholder vote during the pendency of this litigation. Due to the relatively long interval which has occurred since the initial nego-

tiation of the merger it has been necessary on three occasions to extend the termination date of the Agreement.[105] The most recent of these extensions was undertaken by the Du Pont Board of Directors on December 26, 1974, thus continuing the Agreement in existence.[106]

In sum, the striking factor with respect to the merger is the disparity in post-merger gains accorded to each merger party. Du Pont will reap a benefit of some $55,585,646 stemming from the 2½% discounting of Christiana's adjusted net asset value. By contrast, the utilization of net asset value, rather than market value for purposes of valuing Christiana will produce a gain, depending on market conditions, of anywhere from 9 times to 4 times the Du Pont gain.[107] Moreover, since 28.3% of Du Pont common is held by Christiana, the effective discount rate in terms of Du Pont's public stockholders is actually 1.8%. On a pro forma basis the earnings per share of Du Pont common will increase between 4 and 5¢ and the total number of outstanding shares will be reduced by approximately 188,000 shares. In addition, Du Pont will no longer have to concern itself with the additional layer of regulatory and transaction-shaping hassles caused by its relationship with Christiana. However, compared to the

101. DX–15.

102. The exemption is necessitated by section 17(a) of the Investment Company Act which prohibits various transactions, including mergers, between registered investment companies and their affiliates.

103. One of the plaintiffs' attorneys, himself a Du Pont stockholder, participated on a pro se basis in the proceedings before the SEC. Relatives of that attorney and one other pro se litigant at the SEC are among the plaintiffs in this case.

104. See note 109 infra.

105. Suit was originally filed on June 8, 1973. The parties thereafter agreed to a stay of the trial pending completion of the SEC exemption proceedings.

106. DX–41(1)(2) and (3). All Du Pont Board of Directors votes on the merger have been undertaken by a disinterested majority.

107. Based on the relative market prices of both common stocks on April 28, 1972, the date upon which forthcoming merger negotiations were publicly announced, Christiana's stockholders will have a post-merger increase in market value of their (then Du Pont) holdings approximating $491,800,000. The relationship of the two stocks on July 17, 1972, by which time the April 28th market discount of Christiana had closed from 28.5% to 10.3%, will produce a post-merger gain of approximately $210,700,000. The difficulty in attaching a precise dollar figure to the Christiana gain is its entire dependence upon market phenomena such that any gain stems solely from the market discount attaching to closed-end non-diversified investment companies. Further, if the merger gains shareholder approval, and if the market acts rationally, the discount between the two stocks can be expected to close almost completely as the effective date of the merger approaches.

benefits accorded Christiana, these factors may be considered somewhat minimal.[108]

## II. Legal Challenges to the Merger[109]

### A. Fairness Under Delaware Law

■■ Plaintiffs argue that the proposed merger is unfair under Delaware law. They contend Delaware law requires greater or equal sharing of the benefits in a merger between related entities and that the utilization of Christiana's net asset value, rather than its market value, violates Delaware law.

### 1. Legal Standards to be Applied

■■ Prior to resolution of plaintiffs' argument that Delaware law compels the sharing of post-merger benefits, two preliminary questions must be addressed. First, does Delaware law control, and secondly, if it does, what is the standard to be employed in measuring the fairness of the merger? The applicability of Delaware law is made an issue by virtue of

---

**108.** Time has not markedly altered the effects of the merger agreement. Under market conditions extant on May 9, 1975, the first day of trial, the discount rate would have been 2.57%. DX–69. Two formulae have been developed which will produce the exchange ratio and discount rate for any set of market data. They are as follows:

$$DR = 1 - \frac{(11,710,103) \, (MV_{Dc}) \, (ER) + 12,780,000}{(13,417,120) \, (MV_{Dc}) + (16,256) \, (MV_{Dp}) + (46,990) \, (MV_{W}) + 21,738,078}$$

$DR$ = Discount Rate—effective
$MV_{Dc}$ = Market Value—Du Pont common
$MV_{Dp}$ = Market Value—Du Pont preferred
$MV_{W}$ = Market Value—Wilmington Trust
$ER$ = Exchange Ratio—Du Pont common to Christiana common

$$ER = \frac{((13,417,120) \, (MV_{Dc}) + (16,262) \, (MV_{Dp}) + (46,988) \, (MV_{W}) + 21,738,078) \, (1 - DR) - 12,780,000}{(11,710,103) \, (MV_{Dc})}$$

$DR$ = Discount Rate—effective
$MV_{Dc}$ = Market Value—Du Pont common
$MV_{Dp}$ = Market Value—Du Pont preferred
$MV_{W}$ = Market Value—Wilmington Trust
$ER$ = Exchange Ratio—Du Pont common to Christiana common

---

**109.** The Court, *sua sponte*, posed the issue whether this case is ripe by reason of the merger agreement's preconditions of shareholder votes approving the merger and receipt of a favorable tax ruling.

With respect to the shareholder vote, it is concluded that in a suit against a proposed merger, the possibility that the merger parties' shareholders might vote against the transaction is certainly not sufficient to deprive a court of jurisdiction. This is particularly true with respect to actions seeking injunctive relief and may apply with equal force to suits seeking monetary damages. *See Herpich v. Wallace*, 430 F.2d 792, 809–10, 813 (5th Cir. 1970). *Cf. Mutual Shares v. Genesco*, 384 F.2d 540 (2d Cir. 1967).

Similarly, the non-receipt of the tax ruling does not serve to eviscerate the Court's jurisdiction. The Article III requirement of a case or controversy has never been interpreted as requiring the resolution in advance of all underlying contingencies and pre-conditions. *See, e. g., Maryland Casualty Co. v. Pacific Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *A. S. Abell v. Chell*, 412 F.2d 712, 719 (4th Cir. 1969); *Sears Roebuck & Co. v. American Mut. Liab. Ins. Co.*, 372 F.2d 435 (7th Cir. 1967). Moreover, the injunctive context of this litigation in a 10b–5 setting lends further support to the Court's conclusion. *See Herpich v. Wallace*, 430 F.2d 792, 809–10, 813 (5th Cir. 1970); *Mutual Shares v. Genesco*, 384 F.2d 540 (2d Cir. 1967).

Plaintiffs on November 10, 1975 filed a motion seeking a postponement of this Court's decision pending the resolution by the Circuit Court of Appeals for the Eighth Circuit of plaintiffs' appeal contesting the propriety of the SEC's exemption order under section 17. No compelling reasons have been advanced as to why decision in this matter should be postponed especially in view of the fact that the issues before this Court and the Eighth Circuit are separate and distinct. Accordingly, their motion for a postponement was denied. See Docket No. 142.

the fact that the instant suit, which is based both upon diversity of citizenship and the jurisdictional provisions of the Securities Exchange Act of 1934, was initially instituted in the Northern District of Illinois and thereafter transferred under 28 U.S.C. § 1404(a) to this District. Lest defendants in such cases seek to forum-shop by a combination of transfer and reliance upon *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Supreme Court has asserted, in *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) that the transferee district must, in a diversity suit, apply the conflicts rule of the state in which the transferor district is located. It is concluded an Illinois court would hold Delaware law governs derivative suits by minority shareholders of Delaware corporations. *See Continental-Midwest Corporation v. Hotel Sherman, Inc.*, 13 Ill.App. 188, 141 N.E.2d 400, 403 (1957).

The question of what standard Delaware employs to test the propriety of a merger between related entities is far more troublesome. Plaintiffs have asserted that the intrinsic fairness test, which involves "careful scrutiny by the Court" and shifts the burden of persuasion to the proponents of a merger must be utilized. Defendants instead urge application of the business judgment rule, but as a back-up argument urge that the merger passes muster under either test.

■ In general Delaware courts require the existence of two elements, domination and control, and self-dealing, prior to invoking the intrinsic fairness test. *Sinclair Oil Corporation v. Levien*, 280 A.2d 717, 720 (Del.1971); *David J. Greene & Co. v. Dunhill International*, 249 A.2d 427 (Del.Ch.1968); *Puma v. Marriott*, 283 A.2d 693 (Del.Ch.1971); *Liboff v. Allen*, Civil Action No. 2669 (Del.Ch. Jan. 14, 1975). Domination and control can be proven either by the existence of a parent-subsidiary relationship, *Sterling v. Mayflower Hotel Corp.*, 33 Del.Ch. 293, 93 A.2d 107 (Del.1952); *David J. Greene v. Dunhill International, supra*, or, by a minority shareholder

demonstrating an "actual exercise of direction over corporate conduct 'in such a way as to comport with the wishes or interests of the corporation doing the controlling.'" *Liboff v. Allen, supra* at 12 quoting from *Kaplan v. Centex Corporation*, 284 A.2d 119, 123 (Del.Ch.1971). The other necessary element, self-dealing, has been held to occur when the dominant party in a transaction receives something to the exclusion of, and detriment to, the minority shareholders. *See, Sinclair Oil Corporation v. Levien, supra*, 280 A.2d at 720.

Plaintiffs have argued that Christiana controls Du Pont and thus satisfies the Delaware state law domination and control standard. They point to the federal statutory presumption of control under the 1934 Act and the Investment Company Act of 1940, the interlocking directorates of the two companies, and the fact that no Du Pont director has ever been elected without Christiana support, as support for the conclusion that Christiana's 28.3% bloc of Du Pont constitutes working control of that corporation.

■ Delaware law is contrary to plaintiffs' position. First, it is clear that non-majority stock ownership is not sufficient, by itself, to establish domination and control. In *Liboff v. Allen, supra* and *Puma v. Marriott, supra*, Delaware courts refused to apply the intrinsic fairness test to measure transactions in situations involving inter-corporate dealings with 28.5 and 46% stockholders respectively on the ground that domination and control had not been demonstrated. *See also, Kaplan v. Centex Corporation, supra*. Second, whatever the practical effect of Christiana's holdings may be, Delaware courts have considered such factors irrelevant in the absence of a showing that the specific transaction in question has been engineered in unilateral fashion by a dominant party. *Kaplan v. Centex Corporation, supra; Liboff v. Allen, supra* at 11. Finally, while a substantial argument can be made that *Liboff* is distinguishable on the ground that the allegedly dominant stockholder's 28.5% acquisition was a recent develop-

ment as opposed to the long-term relationship between Christiana and Du Pont and the avowed historical purpose of Christiana to serve as a device to manage the duPont family's Du Pont interests, *Puma v. Marriott* remains as an obstacle in plaintiffs' path. Not only was the stock ownership of the purportedly subservient entity in that case of long duration but, as in this case, directors neither proven to be aligned with, nor dominated by, the large stockholder present on both sides of the transaction negotiated and voted upon the proposed transaction.

Despite the foregoing and without reference to the other intrinsic fairness test requirement, self-dealing, this Court is confident that the Delaware courts would nonetheless apply the intrinsic fairness test as a yardstick in the instant case. The precise question at issue here; namely what standard would be applied to measure a merger between a regulated non-diversified investment company and its affiliated company, has never been presented to a Delaware tribunal.[110] Such a merger necessitates an exemption from the SEC upon satisfaction of the far stricter Investment Company Act standard that " * * * the terms of the proposed transaction, including the consideration to be paid or received, are reasonable and fair and do not involve overreaching on the part of any person concerned." Section 17(b)(1), 15 U.S.C. § 80a–17(b)(1). Application of that test implicates the rights of shareholders of both parties to a merger or other transaction between statutory affiliates and not solely the investment company's stockholders. *In the Matter of Christiana Securities Company,* —— *E. I. Du Pont de Nemours and Company* (1974), Investment Company Act of 1970 Release No. 8615 (Dec. 3, 1974); *In the Matter of Bowser, Inc.,* 43 S.E.C. 277 (1967). Since the rights of all parties to such a merger must be examined under the rigorous statutory standard, this Court, after utilizing its *Erie v. Tompkins* [111] divining rod, concludes that a Delaware court would not undertake the hollow intellectual exercise of measuring the merger by a decidedly weaker standard, the business judgment test. Under that standard an objector, who bears the burden of proof, cannot succeed without establishing such a gross disparity in exchanged values as would constitute a conscious abuse of discretion, breach of trust or some other actual or constructive fraud.[112] *Liboff v. Allen, supra* at 15; *Muschel v. Western Union Corp.,* 310 A.2d 904 (Del.Ch.1973); *Cole v. National Cash Credit Ass'n,* 18 Del.Ch. 47, 156 A. 183 (1931). Accordingly, for purposes of Delaware law, the proposed merger must be tested under the intrinsic fairness standard, thus shifting the burden of proof to the defendants to

110. *Manacher v. Reynolds,* 39 Del.Ch. 401, 165 A.2d 741 (Del.Ch.1960), has been proffered on occasion as a Delaware decision dealing with the fairness of merger terms between an investment company and its affiliate. Such a description is misleading since the Chancellor in *Manacher* was concerned solely with the fairness of a proposed litigation settlement in which a merger had been suggested as a means of resolving plaintiffs demand for liquidation of the investment company. Not only was the investment company at issue in *Manacher* non-registered and thus exempt from the need for SEC approval of the transaction, but the Chancery Court was applying its own Rule 23.1, which required it to pass on the fairness of any class action settlement. That Court therefore had no occasion to reach the question presented in the instant case. The foregoing applies equally to *Laufer v. Hunt Foods & Ind.,* Civil Action No. 1411 (Del.Ch. 1962), another Chancery Court appraisal of a settlement. The sole difference between the two settlements is that in *Laufer* the investment company was registered and the SEC *subsequently* exempted the transaction under section 17(b)(1). *Harbor Plywood Corp.,* 40 S.E.C. 1002 (1962).

111. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

112. Under the Delaware business judgment rule a board of directors enjoys a presumption of sound business judgment which remains inviolate unless their decision cannot be attributed to *any* rational business motives. *See Sinclair Oil Corp. v. Levien, supra; Liboff v. Allen, supra* at 15.

154

demonstrate the intrinsic fairness of this merger.[113]

### 2. Post-Merger Gain-Sharing Under Delaware Law

■ Plaintiff has argued that intrinsic fairness under Delaware law requires equal sharing of post-merger gains between both parties to a merger. Typically, attacks on mergers under this standard have involved challenges based upon disparity in the values exchanged at the time of the merger or upon a substantial decrease in the degree of equity participation afforded to one merger party. See, e. g., David J. Greene v. Dunhill International, supra (substantial decrease in equity and earnings per share held unfair); Bastian v. Bourns, 256 A.2d 680 (Del.Ch.1969), aff'd 278 A.2d 467 (Del.1970) (substantial decrease in equity and slight loss in earnings per share held fair); David J. Greene & Co. v. Schenley Industries, Inc., 281 A.2d 30 (Del.Ch.1971) (exchange of cash and subordinated debentures for common stock held fair). In fact, it can be said that the prevailing Delaware law on fairness requires only that the consideration paid be equivalent to the premerger value of the exchanged shares and pays no attention whatsoever to any resulting post-merger gains.[114] See, Brudney & Chirelstein, "Fair Shares in Corporate Mergers and Takeovers," 88 Harv.L.Rev. 297, 322 (1974).

Defendants have argued that any requirement of gain-sharing under Delaware law would conflict with the Congressionally-mandated federal scheme of investment company regulation which is designed to protect the intrinsic value of an investment-company-shareholder's investments. While defendants are correct in their characterization both of the Investment Company Act of 1970 as a comprehensive regulatory scheme[115] and of its purposes,[116] it is not necessary to reach their contention that Section 50 of that Act expressly pre-empts any contrary state law because there is absolutely no authority under Delaware law which would require any post-merger gains to be shared equally or proportionately between closely related entities.[117]

113. Various commentators have suggested that there is little or no content to the intrinsic fairness standard other than its shifting of the burden of proof. See, e. g., Brudney and Chirelstein, "Fair Shares in Corporate Mergers and Takeovers," 88 Harv.L.Rev. 297, 309–10 and n. 34; further, it has been suggested that the business judgment rule and the intrinsic fairness test do not vary significantly in terms of results. See Id. at 318, n. 49. Delaware law on this subject has received far more than its share of trenchant criticism. See, e. g., Cary, Federalism and Corporate Law: Reflections Upon Delaware, 83 Yale L.J. 663, 679–683 (1974); Brudney & Chirelstein, supra; Note, Schlick v. Penn-Dixie Cement Corp.: Fraudulent Mismanagement Independent of Misrepresentation or Nondisclosure Violates Rule 10b–5, 63 Cal.L.Rev. 563, 575 (1975).

114. In Greene v. Schenley, supra, the Chancery Court held fair a merger which involved eliminating the entire equity participation of minority common stockholders by substituting a cash payment and subordinated debentures for the common stock. Since that treatment precluded any post-merger gain sharing whatsoever, including any subsequent market appreciation, it is difficult to posit the existence of a gain-sharing requirement in Delaware.

115. See sections 1(a)(5) and 50, 15 U.S.C. §§ 80a–1(a)(5) and 50.

116. See discussion infra at 60–2.

117. In situations where arms-length bargaining is impossible or unlikely, such as a parent-subsidiary merger context, there is much to be said conceptually for a requirement of equal or proportionate post-merger gain-sharing as a device to artificially provide the otherwise missing arms-length bargain. See generally, Brudney & Chirelstein, "Fair Shares in Corporate Mergers and Takeovers," 88 Harv.L.Rev. 297 (1974). However, the instant case does not even fulfill the Brudney & Chirelstein assumption of a parent-subsidiary relationship as a pre-condition to application of the sharing requirement. Moreover, those commentators have expressed no opinion on mergers involving registered non-diversified investment companies and their operating affiliates. Since both the Investment Company Act of 1940 and the SEC decisions thereunder appear to preclude depriving investment company's shareholders of a substantial portion of the intrinsic value of their investment, see discussion infra at 63–5, the gain-sharing theory may well be inapplicable to such mergers. This is because any such merger which utilizes the investment company's net asset value, as opposed to its

Plaintiffs make a lame attempt to argue that *Sinclair v. Levien, supra,* requires proportionate gain-sharing in a merger between related entities. *Sinclair* is totally silent on this subject. In fact, on the two occasions Delaware courts have had to delineate the fiduciary responsibilities owed by a parent corporation to its subsidiary[118] with respect to sharing in a non-merger context, they have demonstrated a remarkable degree of hostility to the concept of gain-sharing. *See, Meyerson v. El Paso Natural Gas Co.,* 246 A.2d 789 (Del.Ch.1967); *Getty Oil Co. v. Skelly Oil Co.,* 267 A.2d 883 (Del.1970). In *Meyerson* the defendant El Paso held in excess of 80% of its subsidiary Northwest's stock. Under federal law El Paso was therefore allowed to reduce its tax liability through utilization of a consolidated tax return in which its profits were offset by Northwest's considerable losses. Although Northwest's minority shareholders argued that a portion of the parent's tax savings should be shared with the subsidiary, the Chancery Court upheld the entire allocation of the tax savings to the parent.[119] Similarly, in *Getty* the Delaware Supreme Court refused to order a parent to share any portion of its oil import quota with its 71%-owned subsidiary despite the fact that the subsidiary had lost its own oil allocation solely because of its status as the subsidiary of an entity also receiving an import allocation. Although the Court recognized the parent owed a fiduciary responsibility to its subsidiary, it held that " * * * the duty does not require self-sacrifice from the parent." 267 A.2d at 888.

### 3. Propriety Under Delaware Law of Net Asset Value As a Measure of Christiana's Value

Plaintiffs' other major challenge under Delaware law is an argument that the use of Christiana's net asset value as a device to measure Christiana's side of the exchange ratio violates settled precepts under Delaware law. Plaintiffs' principal reliance is placed upon two cases, *Tri-Continental Corp. v. Battye,* 66 A.2d 910 (Del.Ch.1949), *rev'd,* 74 A.2d 71 (Del.1950) and *Sterling v. Mayflower Hotel Corp.,* 93 A.2d 107 (Del.1952). This reliance is misplaced.

*Tri-Continental,* relied upon so heavily by plaintiffs for the proposition that net asset value cannot alone be used to determine the value of a shareholder's investment in a closed-end investment company, is plainly distinguishable. Not only was *Tri-Continental* solely confined to the question of a dissenter's rights and entitlements under the forerunner[120] of Delaware's current appraisal statute, a question most assuredly not involved in the instant proceedings, but the court's reasoning in that case is similarly inapplicable. Although the Delaware Supreme Court recognized that investment companies are generally a medium for long-term investment, it was specifically concerned with the statutory demand of a dissenting stockholder for an immediate cash exchange on the value of his investment. As a result, it felt employing market value as a basic measure of value appropriate because of the short-term focus implicit in utilization of the appraisal remedy, despite the presence of a closed-end discount phenomenon.[121]

---

market value, will always result in unequal gain-sharing whenever the typical market discount phenomenon is present.

**118.** The instant case does not involve a parent-subsidiary relationship. See n. 117, *supra.*

**119.** *Meyerson, supra,* has been castigated by the commentators as being egregiously wrong. *See,* Cary, "Federalism and Corporate Law: Some Reflections on Delaware," 83 Yale L.J. 663, 679–83 (1974); Brudney & Chirelstein, *supra,* assert that the result of the case rests on a "mindless misconception," namely treating "the subsidiary as contributing nothing to the

tax savings" and thus "being entitled to no part of the benefit." *Id.* at 88 Harv.L.Rev. 323, n. 54 (1974). Nor has criticism of Delaware law with respect to its view of corporate fiduciary responsibilities been restricted to the academic battleground. *Cf. Barrett v. Denver Trainway Corporation,* 53 F.Supp. 198 (D.Del. 1943); *Hottenstein v. York Ice Machinery Corp.,* 136 F.2d 944 (3d Cir. 1943).

**120.** Delaware General Corporation Law, 1935 Code, § 2093.

**121.** The vitality of *Tri-Continental* must be characterized as questionable when applied to

Similarly, the *Sterling* case is not authority for the point plaintiffs seek to make. In *Sterling* minority shareholders of a subsidiary slated to be merged into its parent corporation objected on the ground that the exchange ratio failed to compensate them in an amount equal to the liquidating value of their investment in the subsidiary's assets. While the Delaware Supreme Court refused to accept that argument on the facts before them, it expressly indicated that in some circumstances net asset value might be quite important in establishing a proper merger exchange ratio. 93 A.2d at 115. Since the entities involved in that case were not investment companies whose characteristics lend themselves to the use of net asset value as a primary, if not sole, criterion of valuation, *Central States Electric Corporation*, 30 S.E.C. 680, 700 (1949), *Sterling* cannot be considered as authority for plaintiffs' proposition that the utilization of Christiana's net asset value, as opposed to its market value, is contrary to Delaware law.

 In addition, in two cases where Delaware courts have dealt with litigation settlements encompassing a merger between an investment company and its operating affiliate, employment of the investment company's net asset value was expressly accepted as a device for reaching the proposed exchange ratios. *Manacher v. Reynolds, supra*; *Laufer v. Hunt Foods, supra.*[122] While both of

these cases involved judicial appraisal of the fairness of proposed settlements and thus cannot be considered direct authority, the unquestioning acceptance of net asset value in those contexts is, at least, an indication that Delaware courts are indeed employing net asset value as a valuation yardstick in appropriate contexts.

 It is concluded the proposed merger terms are fair under Delaware law.

B. *Plaintiffs' Claims Under Rule 10b–5*[123]

1. *The Proposed Merger as a Scheme to Defraud*

a) *Standing as Derivative Plaintiffs*

The plaintiffs in the instant action have sued in a derivative capacity. Given the Supreme Court's recent adoption in 10b–5 damage actions of the strict *Birnbaum*[124] "purchaser-seller" requirement, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), a question arises as to whether these plaintiffs, who are most assuredly not purchasers or sellers, can maintain this action for injunctive relief under Rule 10b–5. The Court answers this question in the affirmative.

 In *Blue Chip* the Supreme Court recognized various classes of potential plaintiffs seemingly barred by the *Birn-*

---

mergers involving regulated investment companies. The SEC's Division of Management Regulation has recently indicated that the use of state appraisal remedies by dissenting shareholders of merged investment companies violates Rule 22c–1, 17 C.F.R. § 270.22c–1. As a result of such conflict with Rule 22c–1 (Release No. IC–5519, 1/13/69), the Division has opined that the appraisal statutes must be considered superseded under Section 50 of the ICA of 1950. ICA Release No. 8752 (4/10/75). CCH Fed.Sec.L.Rptr. ¶ 80, 154 (74–5 Transfer Binder).

**122.** See note 110, *supra*.

**123.** Rule 10b–5, 17 CFR § 240.10b–5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of

the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

**124.** *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

*baum* rule. One of these classes, namely " * * * shareholders, creditors and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities * * *" *Id.* 421 U.S. at 738, 95 S.Ct. at 1926, encompasses the plaintiffs before the Court. However, the Court expressly noted shareholder members of this class have been able to overcome the *Birnbaum* bar by bringing a derivative suit on behalf of a corporate entity that is itself a purchaser or seller of securities. *Id. See, e. g., Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Pappas v. Moss*, 393 F.2d 865 (3d Cir. 1968). The inquiry therefore must center upon whether Du Pont, on whose behalf the plaintiffs have brought this suit, is a purchaser or seller of securities.

■ Numerous courts, including the Supreme Court, have held that a merger is a sale or purchase of securities. *See, e. g., S.E.C. v. National Sec., Inc.*, 393 U.S. 453, 464–68, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *Knauff v. Utah Construction & Mining Co.*, 408 F.2d 958, 961 (10th Cir.), *cert. denied*, 396 U.S. 831, 90 S.Ct. 83, 24 L.Ed.2d 81 (1969); *Mader v. Armel*, 402 F.2d 158, 159–61 (6th Cir. 1968), *cert. denied*, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459 (1969); *Dasho v. Susquehanna Corp.*, 380 F.2d 262, 266 (7th Cir.), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967); *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 635 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Gould v. American Hawaiian SS. Co.*, 319 F.Supp. 795, 801, n. 11 (D.Del.1970). Although the instant suit involves an as yet uncompleted merger, it too must be held to have conferred "purchaser-seller" status upon Du Pont. This is because the terms "buy" and "purchase" and "sale"

and "sell" are statutorily defined in the 1934 Act to include any contract to buy or sell. Sections 3(a)(13) and (14) of the 1934 Act. 15 U.S.C. § 78c(a)(13) and (14).[125] Since Du Pont has entered into a contract regarding the merger with Christiana, and has thus acquired a contractual right to "purchase" Christiana's securities and "sell" its own, the "in connection with the purchase or sale of any security" requirement of Rule 10b–5 is satisfied. *Cf. Blue Chip*, 421 U.S. 723, at 732, 95 S.Ct. 1917, at 1924, 44 L.Ed.2d 539 (1975); Jacobs, "The Role of Securities Exchange Act Rule 10b–5 in the Regulation Of Corporate Mismanagement," 59 *Corn.L.Rev.* 27, 45, n. 114 (1973).

Similarly, courts have been content to confer "purchaser-seller" status upon a corporate entity on the basis of a board of directors resolution authorizing a merger, notwithstanding the fact that the requisite shareholder approval had not yet been obtained. *See, e. g., Herpich v. Wallace*, 430 F.2d 792, 809–10 (5th Cir. 1970). Thus, the July 17, 1972 action by Du Pont's Board of Directors approving the merger would be sufficient to cloak Du Pont in "purchaser-seller" raiments. Finally, in *Blue Chip* the Supreme Court was speaking solely to 10b–5 suits seeking damages and did not have occasion to address the *Birnbaum* rule's applicability to suits seeking injunctive relief. Therefore, a line of case law not requiring "purchaser-seller" status in injunctive 10b–5 contexts but merely necessitating allegations of a causal connection between the violations alleged and the pleader's injuries would appear to arguably retain vitality and lend additional support to plaintiffs' standing in the instant proceeding. *See, Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Britt v. Cyril Bath Co.*, 417 F.2d 433, 436 (6th Cir.

---

**125.** Section 3(a)(13) provides that: "The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13).

Section 3(a)(14) provides that: "The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(14).

1969); *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546 (3d Cir. 1973).

### b) The Alleged Scheme to Defraud[126]

Plaintiffs have argued the negotiation of the proposed merger constituted a scheme to defraud Du Pont's public stockholders for the benefit of its controlling persons, namely Christiana and its affiliated persons. In their view, the scheme consists of terms unfair to Du Pont combined with deception in the form of both a material misrepresentation and a failure to disclose material information.[127]

 Plaintiffs have proposed two standards which they assert are the proper tests of an unfairness claim under Rule 10b–5. First they argue that "a claim of unfairness means simply that the corporation * * * received too little in selling its stock or exchanging it in a merger." Note, "The Controlling Influence Standard in Rule 10b–5 Corporate Mismanagement Cases," 86 *Harv.L. Rev.* 1007, 1033 n. 111.[128] Secondly, they propose what can best be described as the olfactory test, namely "if it smells bad, it is bad."[129] Although this pungent test would require utilization of judicial processes not normally employed in resolving litigation conflicts, the Court declines to adopt either it or the other standard urged by plaintiffs. Instead, fairness in this context must be tested by examining whether the corporation received either "wholly inadequate consideration," *Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968) (en banc) or a "fraudulently low price." *Pappas v. Moss*, 393 F.2d 865, 869 (3d Cir. 1968).

However, rather than assess the fairness of the transaction by merely looking with blinders at the relative gains attendant upon consummation of this merger, one must also consider the Investment Company Act of 1940. This is necessary because the Investment Company Act of 1940 and decisions thereunder erect a substantive standard for fairness in dealings between registered investment companies and their affiliates.

 Before reaching the merits, however, the Court must dispose of two arguments raised by defendants in an attempt to preclude judicial consideration of plaintiffs' claim. Defendants first urge that under the rule of *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255 (3d Cir. 1972), this Court is not free to examine the fairness of the proposed merger under federal law because of the prior determination in that regard by the SEC. In *Kohn*, the Court of Appeals indicated that a district court was not free to reexamine an issue involving a Zambian corporation which had previously been determined by a Zambian court. However, *Kohn* is distinguishable from the instant case. The principle of comity among nations which was the basis for the *Kohn* holding is clearly inapplicable to the decision of an administrative tribunal. Moreover, res judicata and collateral estoppel do not ordinarily apply to decisions of the SEC under section 17(b) of the Investment Company Act of 1940. *Entel v. Allen*, 270 F.Supp. 60, 66 (S.D.N.Y.1967). Accordingly, *Kohn* is no bar in this proceeding.

 Defendants also urge that Rule 10b–5 does not reach claims of cor-

---

**126.** Plaintiffs' claim can also be viewed as stating a claim under clause 3 of Rule 10b–5. 17 C.F.R. § 240.10b–5(3). This factor is not of determinative significance in the instant matter.

**127.** Since the plaintiffs have also at various points appeared to be arguing that the alleged misrepresentation and alleged failure to disclose are, by themselves, violations of Rule 10b–5(2), see note 2, *supra*, these matters will, in addition, be treated separately. *See* discussion *infra* at 76.

**128.** At least one difficulty with this standard is that plaintiffs have overlooked the authority invoked for it in the above-cited Note which relies upon *Sterling v. Mayflower Hotel Corp.*, 33 Del.Ch. 293, 93 A.2d 107 (Del.1952) and *Bastian v. Bourns, Inc.*, 256 A.2d 680 (Del.Ch. 1969). Not only are those cases inapposite to determining elements of a 10b–5 claim, but the results of those cases can hardly be said to support the proffered standard.

**129.** Plaintiffs' Reply Brief, Docket No. 131 at 7.

porate mismanagement. While they rely upon decontextualized dictum in *Superintendent of Insurance v. Bankers Life and Casualty Insurance*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) and upon *Popkin v. Bishop*, 464 F.2d 714, 720 (2d Cir. 1972), they have overlooked two critical factors. First, *Bankers Life* indicates that the presence of a securities transaction alleged to be fraudulent is sufficient to activate section 10(b) and Rule 10b–5 in an internal corporate context. *See Id.* 404 U.S. at 12–13, 92 S.Ct. 165. Second, there can no longer be any question as to whether schemes by insiders or controlling persons are within the scope of protection accorded by Rule 10b–5 where they are alleged to have concealed information or otherwise manipulated a securities transaction so as to improperly deprive a corporate entity or its shareholders. Not only have Courts given affirmative responses to the question in the past, especially where the corporate entity or its representatives have been deceived, *see, e. g., Pappas v. Moss, supra* ; *Schoenbaum v. Firstbrook, supra* ; but one circuit has recently indicated that such a cause of action exists even in the absence of any misrepresentations or failures to disclose. *Schlick v. Penn-Dixie Cement Corporation*,[130] 507 F.2d 374 (2d Cir. 1974). *See also, Bryan v. Brock & Blevins Co.*, 490 F.2d 563 (5th Cir. 1974).

c) *Fairness Under the 1940 Act*

■ The Investment Company Act of 1940 is a comprehensive federal regulatory scheme designed to protect shareholders of investment companies from a variety of sharp practices that had become widespread during the 1930s. *See generally*, "Comment, The Investment Company Act of 1940," 50 *Yale L.J.* 440, 441–2 (1941); Note, "The Investment Company Act of 1950," 41 *Col.L.Rev.* 269

(1941); *Brown v. Bullock*, 194 F.Supp. 207 (S.D.N.Y.1961). Congress concluded that state regulation of investment companies was "impossible," 15 U.S.C. § 80a–1(a), and instead created a pervasive regulatory program aimed at countering specific categories of abuse directed at shareholders of investment companies. *See* 15 U.S.C. § 80a–1(b). *Entel v. Allen*, 270 F.Supp. 60 (S.D.N.Y.1967). Among the most egregious of these abuses was an almost institutionalized phenomenon of investment companies and their portfolios being managed in the interest of affiliates, brokerage concerns or dealer interests, as opposed to being operated for the benefit of their shareholders. *See* 15 U.S.C. § 80a–1(b)(1) and (2); *Herpich v. Wallace, supra*, 430 F.2d at 801; *Entel v. Allen, supra*, at 65. *See also*, "Comment," *supra*, 50 *Yale L.J.* at 441–2. In order to remedy this particular practice, Congress decided to prohibit securities transactions between investment companies and affiliated persons[131] thereof, 15 U.S.C. § 80a–17(a), except where the SEC had granted an exemption on the grounds, *inter alia*, that the transaction is fair to all persons concerned, free from overreaching and consistent with the Act's purposes. 15 U.S.C. § 80a–17(b). It is under these provisions that the SEC exemption in the instant case was granted.[132]

The gist of plaintiffs' 10b–5 fairness arguments is that Christiana and its shareholders are, notwithstanding the fiduciary obligations stemming from their control position, improperly profiting at the expense of Du Pont because the market value of Christiana's shares was not utilized in developing the exchange ratio.[133] Viewed from another perspective, plaintiffs are simply attacking the use of Christiana's net asset value since that figure was substantially higher than the market value of Christiana common.

---

130. A close reading of *Schlick* indicates that *Popkin v. Bishop, supra*, may well have been overruled *sub silentio* or seriously undermined. *See* Note, "*Schlick v. Penn-Dixie Cement Corp.*", 63 *Cal.L.Rev.* 563, 572 (1975).

131. See note 8, *supra*.

132. The correctness of the issuance of that exemption is not before this Court. Instead that question is presently before the Circuit Court of Appeals for the Eighth Circuit.

133. Complaint, ¶ 11 at 14.

In so arguing plaintiffs have overlooked the Investment Company Act of 1940.

The 1940 Act, as detailed above, was designed to protect shareholders of investment companies. One mode of guarding those shareholders' interests was to create various restrictions and prohibitions designed to protect their intrinsic investment in a company's net assets. Thus, for example, the Act erected stringent restrictions on the issuance of senior debt or securities by requiring asset coverage of 200% or 300% respectively for any senior stock or debt securities issued. 15 U.S.C. § 80a–18(a)(1) and (2). The obvious purpose behind these restrictions was to protect common shareholders against dilution of their intrinsic investment value through a highly leveraged capital structure, 15 U.S.C. § 80a–1(b)(7), which, in a falling market, could dissipate their investment through a corresponding decline in the market value of the company's securities portfolio. This in turn would leave, after accounting for the prior entitlements of the senior securities, a highly eroded net asset value for the common shareholders. In addition, the Act raised an additional obstacle to highly leveraged capital structures by requiring dividend restrictions in companies with senior debt or stock to preclude avoidance of the aforementioned asset coverage standards. 15 U.S.C. §§ 80a–18(a)(1)(B) [134] and 80a–18(a)(2)(B).

The Act also made net asset value, based upon the market prices of an investment company's portfolio securities, the fundamental valuation criterion of registered investment companies. 15 U.S.C. § 80a–2(a)(41). *Central States Electric Corporation*, 30 S.E.C. 680, 700 (1949). Moreover, despite the fact that the closed-end discount phenomenon was well known in 1940, *Christiana Securities Company, supra* at 23, n. 57, Congress decided to prevent dilution of closed-end stockholders' intrinsic values by preventing the issuance of any new common stock "at a price below the current net asset value of such stock." 15 U.S.C. § 80a–23(b).

The Securities Exchange Commission, the agency authorized by Congress to implement the 1940 Act and pass upon otherwise prohibited transactions between investment companies and their affiliates pursuant to section 17(b), 15 U.S.C. § 80a–17(b), has consistently utilized net asset value as the controlling factor in section 17 proceedings. *See, e. g. Central States Electric Corporation*, 30 S.E.C. 680, 700, 724–5. This has been true notwithstanding the fact that the market value of the applicant investment company's stock was significantly lower than its net asset value. *See, e. g., Delaware Realty & Investment Company*, 40 S.E.C. 469 (1961); *Harbor Plywood Corporation*, 40 S.E.C. 1002, 1010 (1962); *Detroit and Cleveland Navigation Company*, ICA Rel. Nos. 3082 and 3099 (July 27, 1960 and August 19, 1960); *Townsend Corporation of America*; ICA Rel. No. 4045 (Sept. 2, 1964), CCH Fed. Sec.L.Rptr. ¶ 77,120. Net asset value has also been utilized where no market existed for the common stock of an applicant investment company. *Eastern States Corporation*, ICA Rel. No. 5693 (May 28, 1969); *Huyler's*, ICA Rel. Nos. 5773 and 5809 (August 13, 1969 and Sept. 9, 1969); *Southport Commercial Corporation*, ICA Rel. Nos. 4165 and 4180 (Feb. 17, 1975 and March 5, 1965).

Courts are obliged to accord great deference to an administrative agency's construction of the statute it administers. *See, Lucas Coal Company v. Interior Board of Mine Operations Appeals*, 522 F.2d 581 (3d Cir. 1975). Plaintiffs have been unable to demonstrate any appropriate reason why net asset value should be discarded, the SEC's teachings disregarded, and Congress'

---

**134.** While section 18 is not directly involved in the present case, nor is Christiana a highly leveraged investment company, reference to the provisions of section 18 have been made as additional illustrations of the rigorous restrictions applied by Congress to protect shareholders of regulated investment companies.

mandate ignored in the instant case. The use of net asset value as a valuation device for investment companies stems from the long-term investment characteristics of such entities. *See Christiana Securities Company, supra* at 23, n. 57. Since the bulk of Christiana stock has been held by long-term investors there is simply nothing that suggests the inapplicability of net asset value in development of the merger ratio. Further, were net asset value to be cast aside and market value utilized as a significant factor in calculating the instant exchange ratio, the resultant gain to Du Pont's shareholders would improperly deprive Christiana's stockholders of a substantial portion of the intrinsic values of their holdings. *See Id.* at 24.

d) *The News-Journal Valuation*

Plaintiffs have also attacked Mr. Manno's valuation of $24,260,000 for the News-Journal common stock held by Christiana as unreasonably high. In addition they urge that the 2.5% discount from net asset value is ephemeral and nothing more than a device to insulate Du Pont from the tremendous risk it runs of not being able to dispose of the newspaper at a price consistent with the Manno appraisal.

Plaintiffs have simply been unable to demonstrate that the Manno appraisal is illogical or unreasonable. While the value he placed upon the News-Journal did initially surprise all the negotiators the manner in which he developed the valuation and his stature in the media valuation field withstood searching analysis by the Du Pont negotiators and their financial advisors prior to negotiations [135] and remained unsullied through trial. While there is no question that the Du Pont negotiators utilized the potential risk of loss as a bargaining tool with respect to obtaining the 2½% discount,[136] it is simply an exag-

geration to conclude that the risk will eviscerate the entire gain attaching to Du Pont in this transaction. Moreover, it is not correct to urge, as plaintiffs have, that the risk attendant upon disposal of the News-Journal was a "key element" in developing the discount since the minimal percentage of Christiana's assets attributable to the News-Journal, even relative to the Du Pont gain, undercuts such a claim. Moreover, it would appear that a substantial factor in whatever risk there may be is due, not simply to the alleged unreasonableness of the Manno valuation, but rather to Du Pont's express desire to be selective because of its overall community interest in obtaining a responsible purchaser of the only newspaper in its headquarter city.[137]

Finally, at trial, plaintiffs attempted to undercut Manno's appraisal by pointing to the rather high price/earnings ratio developed through a comparison of actual News-Journal earnings and the appraised value. However, Mr. Manno testified that it is the prospective, rather than actual, earnings which would be important to a purchaser of the News-Journal since various operating inefficiencies which can be readily solved are responsible for the somewhat depressed earnings. Not only have plaintiffs submitted no evidence that contradicts Mr. Manno's assumptions about the importance to a buyer of prospective earnings in the newspaper industry, but they have similarly left unchallenged his further testimony that in the three-year interval since his appraisal was rendered, price/earnings ratios have become relatively unimportant to prospective media purchasers.[138]

e) *Market Impact*

An additional contention of plaintiffs is that the merger will seriously injure Du Pont stockholders because the merg-

---

**135.** T-821; 824.

**136.** There is nothing improper about offsetting risks by allowing greater participation in the other party's net assets in the context of a section 17 transaction. *See, Delaware Realty,* *supra* at 473–4; Iowa Interests Corporation, 40 S.E.C. 927 (1961).

**137.** DX–1 at 17.

**138.** T–686–91.

er will have a substantial deleterious effect upon the market value of Du Pont common as former Christiana shareholders dump huge blocks of such stock on the market. The Court finds no merit whatsoever in this argument.

■ First, the evidence indicates that there are no present intentions by Christiana stockholders or their trustees to sell any portion of their new Du Pont holdings after the merger.[139] Moreover, WTC, which holds approximately 50% of the Christiana stock in trust, has indicated that apart from an occasional sale to pay taxes upon, or otherwise settle, a large estate, it has no intent to dispose of any Du Pont common received in the merger.[140]

Second, there is little reason to anticipate any substantial amount of post-merger selling, especially by the 75% of Christiana's stockholders who are affiliates of Du Pont. The merger is expressly conditioned upon receipt of an IRS ruling that the merger will be tax-free, so that no selling need occur in order to raise cash to cover any tax liabilities. Further, many of the large Christiana stockholders have either an extremely low, or, in the case of 25% of the outstanding Christiana shares, a zero tax basis. These tax bases, which will be transferred to the Du Pont stock received in the merger, are an additional deterrent to selling because of the substantial capital gains tax liabilities which would be triggered by a sale of the stock.[141] In addition, unlike most mergers where stockholders of the disappearing entity become participants in an entirely different venture, the Christiana stockholders will own directly after the merger what they now hold indirectly. This continuity of investment has the effect of removing a typical post-merger incentive to sell.[142]

Third, approximately 75% of the outstanding Christiana stock is held by Christiana affiliates and is thus deemed restricted under the Securities Act of 1933.[143] Following the merger the same restrictions will apply to shares of Du Pont common received by the former Christiana affiliates.[144] Because of these restrictions the merger parties have entered into a registration rights agreement which authorizes Du Pont to make registration rights available twice annually in order to permit sales by former Christiana affiliates.[145] The existence of the agreement cannot be taken as an indication of an intent to sell, but rather is a common business practice in appropriate circumstances.[146] The registration rights agreement provides for Du Pont to file a registration statement should affiliates seek to sell in a firm commitment underwriting of at least $25 million.[147] One motivation behind this agreement is to structure any sales by affiliates in an orderly manner.[148] This same motivation explains why the agreement specifies that any secondary underwritings be done by Morgan Stanley or another investment banker acceptable to Du Pont.[149]

■ The financial advisors were asked to indicate what effect, if any, the merger would have upon the market for Du Pont common. All three advisors indicated in their reports to the SEC and in testimony that no lasting adverse effect could be anticipated whether from direct selling or through large secondary offerings.[150] While a slight effect might occur at the time of a large secondary offering, such an effect would be tempo-

---

139. T–777–9; 963–9; see DX–4, Exhibit E.
140. T–967.
141. T–203–5; 448.
142. See T–201–3.
143. PTO ¶ 7.
144. DX–1, Amendment 5 at 17.
145. DX–43.
146. T–216; 453–4; 624–5.
147. DX–43.
148. T–213–18; 453–4.
149. DX–43.
150. DX–6 at 8–9; DX–10 at 8; T–205–1; 241–70; 456–62. See DX–16; DX–55; DX–57.

rary since the market can be assumed to function rationally with the result that buyers of Du Pont common, attracted by any reduction in price, will quickly force the price upward again. *Christiana Securities Company, supra* at 21. Plaintiffs did present a witness who testified to the contrary and indicated that the merger would have a depressant effect on the market price of Du Pont common. However, his testimony is entitled to little or no weight since he had no experience in assessing the market impact of mergers, was not familiar with any specific mergers and was totally unfamiliar with the market performance of Christiana common, the trading volume of Du Pont and the tax and personal status of Christiana stockholders.[151]

Plaintiffs have also made much of allegedly contrary positions on market impact taken by Du Pont at the time of the forced antitrust divestiture of Du Pont's General Motors holdings in the early Sixties, *See Generally, U. S. v. E. I. du Pont de Nemours,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), and have introduced much material detailing those earlier proceedings. These are irrelevant in the instant case because of the entirely distinguishable situation presented by that divestiture. There some 63 million shares held by Du Pont, approximately 23% of the then outstanding General Motors common, were required to be divested over a 10-year period through the forced sale of 20 million shares and the distribution of the remaining shares as dividends to all non-Christiana Du Pont stockholders. Since the effect of a court order requiring continuing sales of the General Motors shares attributable to Christiana would be to create a known and highly visible market "overhang," Du Pont argued that the market value of General Motors stock would decrease. By contrast there is no "overhang" in the present case because of the absence of forced sales. Moreover, Du Pont in hearings before Congress, following the divestiture decree predicted a substantial amount of additional selling in a disorganized manner by Du Pont stockholders to obtain the funds necessary to satisfy the tax liabilities attaching to the dividends of General Motors stock which, under then-existing law,[152] would be taxable at ordinary income rates. Since the present merger is expressly conditioned upon receipt of a revenue ruling indicating its tax-free nature,[153] there will be no occasion for the forced selling that Du Pont predicted in its ultimately successful efforts in 1962 to persuade Congress to alter the tax effects of the divestiture upon its shareholders.

f) *Fiduciary Duty to Seek Financial Advice*

█ Finally, plaintiffs have alleged fiduciary duty violations on the part of the Du Pont negotiators because they allegedly negotiated the merger agreement without meaningful financial advice. At the basis of this contention is the belief that all advice rendered by both Morgan Stanley and First Boston[154] in their initial reports was meaningless because of the consideration accorded the Section 333 liquidation alternative. In sum, they urge that the negotiators had a duty to refrain from continuing negotiations following the demise of Section 333 because they would have been able to negotiate a higher discount from adjusted net asset value. The difficulty with these arguments is that plaintiffs

---

**151.** T–71–3; 97; 109–11; 117–8.

**152.** Congress subsequently decided to alter the tax effect of receipt by the shareholders of the General Motors shares by enacting Section 1111 of the Internal Revenue Code which provided that receipt of divested stock shall be considered a non-taxable event. *See* 26 U.S.C. § 1111.

**153.** *See* p. 34, and n. 109, *supra.*

**154.** Kidder-Peabody as financial advisor to Christiana is ignored for purposes of this discussion since it cannot be persuasively urged that there was a fiduciary duty owed by the Du Pont negotiators to rely upon the advice of Christiana's financial advisor.

have not only overlooked reality but they have seriously misunderstood the relationship between negotiators and financial advisors.

First, it is not at all clear that any financial advice is necessary, even in the negotiation of a transaction between parties that are so inextricably intertwined that arms-length bargaining is an absolute impossibility. *See Bastian v. Bourns, supra. Cf. In the Matter of Christiana Securities Company*, p. 14, n. 38. Secondly, the negotiators did have meaningful financial advice. Not only had the advisors given the negotiators a clear picture of what factors were significant in developing merger terms (net asset value) and what factors were not entitled to weight (market value), but they traced a complete history of all available precedents regarding mergers between investment companies and their operating affiliates. The ranges of acceptable terms set forth by the advisors can similarly be deemed useful. First Boston never relied upon Section 333 and accordingly its initial recommendations never changed in any material aspect. While Morgan Stanley did subsequently revise the maximum range of its discount, the Du Pont negotiators were, from the beginning of negotiations, pressing for a discount that exceeded the upper end of Morgan Stanley's recommended terms. Moreover, plaintiffs have simply overlooked the fact that prior to the commencement of the actual negotiations the negotiators knew that First Boston's recommendations would remain constant and that a slight upward move by Morgan Stanley was forthcoming.

Implicit in plaintiffs' arguments on this issue is a concept that financial advisors control the conduct of negotiations. The simple, and perhaps most appropriate, response to that notion is that advisors advise; negotiators negotiate. Were plaintiffs' view that terms recommended by financial advisors become binding upon negotiators to be accepted, it is not difficult to imagine that corporate managers would become quite reluctant to retain financial advisors lest they find themselves constrained to press for terms that they know are unattainable because of the other party's intransigence. In the instant case the Du Pont negotiators made a judgment to press forward with negotiations after Section 333 and its constraints were eliminated, believing that their bargaining position was best served by capitalizing on the sudden weaknesses of their Christiana counterparts. Plaintiffs are asking the Court to second-guess the negotiators and conclude that a stronger negotiating posture would have developed after the second set of advisors' reports. The evidence in this case suggests otherwise since there were strong indications that Christiana would go no higher than 2.5%. Further, there is no reason to enter the ethereal realm of speculation and hindsight. The ability to make second-guesses is not sufficient to prove violations of one's fiduciary obligations. Since plaintiffs did not produce a scintilla of evidence that improper motivations or divided loyalties were responsible for what the Court regards as a sound negotiating stratagem which ultimately resulted in a discount higher than any previously approved by the SEC, they cannot succeed on this facet of their case.

In sum, the evidence strongly contradicts the existence of a scheme to defraud DuPont stockholders by conferring windfall benefits upon the Christiana stockholders. The Du Pont efforts, especially by Shapiro, to erase the Section 333 alternative and press for the highest discount they believed obtainable and acceptable to the SEC [155] are inconsistent with the malevolent intent ascribed to them. Similarly, had those negotiators wanted to benefit Christiana, they would not have exhibited concern over what

155. The highest previous discount in a merger requiring approval under section 17 was 1.5% in the *Delaware Realty* case. However, because of overlapping stock ownership in that case the net discount was .9%.

they felt was a high appraisal for the News-Journal but instead would have simply let that valuation pass by without any attempt to examine its basis.

2. *Alleged Misrepresentations and Omissions*

Plaintiffs have alleged that the joint Du Pont-Christiana Application to the SEC [156] contains a material misrepresentation and an omission that is equally material. These arguments will be treated seriatim.

a) *The Alleged Omissions Regarding the News-Journal*

Plaintiffs have argued that no disclosure of the Du Pont concern with respect to the News-Journal valuation is present in the materials filed with the SEC. They further contend that such omissions are material because of the substantial risk of loss Du Pont bears regarding disposal of the News-Journal.

When an omission or failure to disclose is alleged as a cause of action under Rule 10b–5 it is not necessary to specifically prove anyone has relied upon the omission. Instead, "all that is necessary is that the facts withheld be material [157] in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–4, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Rochez Bros. Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir. 1974); *See generally,* Bromberg, *Securities Law, Fraud—SEC Rule 10b–5* §§ 2.6 and 8.6 (1967). However, if a "defendant is able to demonstrate that there was clearly no reliance" such that "the non-disclosure cannot be said to have caused the subsequent loss, * * * recovery should be denied." *Rochez Bros. Inc. v. Rhoades, supra* at 410.

There is no occasion here to determine whether the allegedly omitted facts are material because a perusal of the Application filed with the SEC indicates that full disclosure regarding the News-Journal did occur. Thus, the Application explicitly discloses the possible risks attaching to a subsequent Du Pont sale of the News-Journal in unequivocal terms:

"Du Pont believes that it will have risk of possible loss upon sale of the News-Journal Co., considering that (1) potential buyers may not be willing to meet a sale price reflecting substantially full earnings potential, as anticipated by Mr. Manno, (2) conditions prevailing at the time of sale will have effect on the sale price obtained, and (3) Du Pont will have need to be selective, in the light of its overall community interests, to assure sale to a fully responsible buyer." DX–1 at 17.

In addition, the SEC was provided News-Journal financial statements, balance sheets and profit-and-loss statements covering the period from 1967 through April 22, 1972.[158] Nor can plaintiffs claim that the Du Pont Board of Directors was misled by any failure to disclose the risk because similar disclosure was made to them well in advance of their vote accepting the merger in principle on July 17, 1972.[159]

b) *Alleged Misrepresentations Regarding the Use of Financial Advisors*

Plaintiffs contend that the SEC Application contains a material misrepresentation. The phrasing they find objectionable is as follows:

"The special Board committees of Du Pont and Christiana had discussion with all of the financial advisors regarding the scope of their studies, factors considered, and ranges of merger

---

156. DX–1.

157. The test for materiality is basically an objective standard. *See List v. Fashion Park,* 340 F.2d 457 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); *Rochez*

*Bros. Inc. v. Rhoades,* 491 F.2d 402, 408 (3d Cir. 1974).

158. DX–1, Amendment 1, Exhibit I.

159. PX–9; PX–10.

terms they considered fair and reasonable. The special Board committees each received copies of the reports of each of the financial advisors. Merger negotiations then were undertaken by the special Board committees and agreement was reached that Christiana's adjusted net asset value should be discounted 2½% for purposes of the merger." DX–1 at 12.

Their particular complaint is that since the final reports of the financial advisors were appended to the Application, a Du Pont shareholder examining the Application and its appendices would be misled into thinking that those later reports were the reports referred to in the Application. For a variety of reasons their position is untenable.

First, the reports and opinion letters simultaneously filed as exhibits to the Application[160] completely disclose the fact that an earlier set of reports had been submitted to the negotiating committees.[161] Moreover, there is also disclosure of the fact that negotiations had been completed *prior* to submission of the later reports.[162] Similarly, any claim

that the Du Pont Board had no knowledge of the actual chronology is doomed to failure because the same reports and opinion letters appended to the SEC Application were provided to the Du Pont board on July 10, 1972.[163]

 Unlike an omission, the actionability of which is satisfied by a showing of its materiality, *Affiliated Ute, supra; Rochez Bros. Inc. v. Rhoades, supra,* it is necessary with respect to a misrepresentation to prove reliance upon the misrepresentation to recover under Rule 10b–5. *List v. Fashion Park, supra; Rochez Bros. Inc. v. Rhoades, supra.*[164] Plaintiffs have submitted no evidence whatsoever indicating that any Du Pont stockholder has relied upon the alleged misrepresentation in the SEC Application,[165] a fact which further serves to demonstrate the unreasonableness of plaintiffs' misrepresentation argument.

The Court concludes that both the merger itself and the manner of its negotiation are in accordance with requirements of federal law.

---

160. See Docket No. 139.

161. DX–1; DX–3; DX–12.

162. *Id.*

163. Docket No. 139. *See* PX–9; PX–10.

164. There is case law indicating a relaxed causal connection requirement in actions seeking injunctive relief for violations of Rule 10b–5. *See, e. g., Mutual Shares Corp. v. Genesco Corp.,* 384 F.2d 540 (2d Cir. 1967). *But see,* Bromberg, *Securities Law, Fraud-Rule 10b–5,* § 4.7 at 86.26. The rationale is that a court will then have an opportunity to prevent further harm without a requirement that a loss be shown or causal link between the loss and misrepresentation be proven by demonstrating reliance. *See Id.* However, the Mutual Shares case assumes the existence of actual harm to the corporation or its shareholders as a result of a material misrepresentation, a situation that is sharply distinguished from the present case. *Compare Pacific Insurance Co. of N. Y. v. Blot,* 267 F.Supp. 956 (S.D.N.Y. 1967). In addition, the posture of the misrepresentation claim in this case is more readily analogous in terms of requiring proof of reliance to a suit for damages following completion of a transaction than to a suit seeking to enjoin a transaction. This is because the phase of the transaction involving the alleged

misrepresentation, the SEC application, has long since been completed following exhaustive hearing and consideration by the SEC.

165. Plaintiffs have also pointed to language contained in preliminary proxy materials subsequently added to the SEC application at the request of the SEC staff. This language is identical to the previously quoted Application statement claimed to be a misrepresentation, *See* DX–1, Amendment 5 (Oct. 25, 1972) at 6. Since the preliminary proxy materials were never distributed, bear a legend that they are for "Information of the Securities & Exchange Commission only" and are simply an amendment to the Application which already contained the reports and final opinion letters of the financial advisors, there is no need to separately consider plaintiffs' claim with respect to these materials. Had those preliminary proxy materials ever been sent to Du Pont stockholders, a different conclusion might well be required, especially because proof of reliance in the context of a shareholder vote would not be required. *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255 (3d Cir. 1972), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). *See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). *Cf. Rochez v. Rhoades, supra* at 410, n. 14.