# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WESTERN STANDARD, LLC,     )
Individually and as Stockholder     )
Representative for Former BancTec, Inc.   )
Common Stockholders,     )
    )
           Plaintiff,     )
    )
       v.     )   **C.A. No. 2018-0280-JRS**
    )
SOURCEHOV HOLDINGS, INC. and   )
PANGEA ACQUISITIONS, INC.,     )
    )
       Defendants.     )

## MEMORANDUM OPINION

Date Submitted: April 3, 2019
Date Decided: July 24, 2019

Rudolf Koch, Esquire, Matthew W. Murphy, Esquire and Anthony M. Calvano, Esquire of Richards, Layton & Finger, P.A, Wilmington, Delaware and Samuel J. Lieberman, Esquire of Sadis & Goldberg LLP, New York, New York, Attorneys for Plaintiff.

T. Brad Davey, Esquire, Matthew F. Davis, Esquire and Kody M. Sparks, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

When a Delaware court addresses a breach of contract claim at the pleadings stage, the analysis typically follows one of two paths. If the contract is unambiguous, meaning it is susceptible to only one reasonable construction, the court applies that construction to determine whether the plaintiff has stated a viable claim for breach. If the court determines the contract is ambiguous, meaning it is susceptible to two or more reasonable constructions, the court denies the motion and directs the parties to present extrinsic evidence to aid the court in its search for an objective manifestation of intent. In rare instances, however, the court is unable to divine any meaning from the contract. This is one of those cases. Because the Court cannot understand the contract, it cannot endeavor to construe it. Extrinsic evidence is required to discern what the parties were trying to accomplish and how the words they chose in their contract were meant to facilitate that intent.

In early 2014, Defendant, Pangea Acquisitions, Inc. ("Pangea"), acquired BancTec, Inc. ("BancTec") through a merger of BancTec and a Pangea subsidiary. The merger agreement provides that contingent, or "earn-out," consideration will be paid to former BancTec stockholders in the event Pangea's controlling stockholder realizes certain returns on its post-merger Pangea stock. Plaintiff, Western Standard, LLC, the stockholder representative for BancTec stockholders as designated in the merger agreement, alleges the earn-out was triggered by a 2017 stock-for-stock transaction involving Pangea's controlling stockholder, Pangea's parent company

1

(Defendant, SourceHOV Holdings, Inc. ("SourceHOV")) and others. Defendants disagree and refuse to pay. Hence, the breach of contract claim.

According to Defendants, the Court need not engage in any construction of the operative contract because the stock to which the earn-out right attached was extinguished in a merger prior to the alleged triggering transaction in 2017. Alternatively, Defendants maintain that the unambiguous terms of the operative contract reveal that no earn-out payment is due. They seek dismissal of Western Standard's breach of contact claim on both grounds under Chancery Rule 12(b)(6).

In response, Western Standard argues that the controlling stockholder's Pangea stock remained intact when the stock-for-stock transaction occurred in 2017, and Defendants' failure to pay the earn-out consideration violates the clear and unambiguous terms of the merger agreement. Alternatively, it argues the merger agreement is ambiguous and, therefore, the parties must be afforded an opportunity to present extrinsic evidence in support of their proffered constructions of the agreement.

I have read the operative contract—many times. I have read the parties' briefs in which they offer their respective constructions of the contract—many times. But, as explained below, this is one of those rare instances where the Court cannot understand the relevant provisions of the contract at all, much less attach definitive meaning to them. Because I disagree with Defendants that the controlling

2

stockholder's Pangea stock indisputably was extinguished prior to the alleged 2017 triggering event, I must turn to the contract and attempt to construe it, as a matter of law, before determining whether Western Standard has a viable breach of contract claim. Because I am unable to make that determination on the pleadings, the motions to dismiss must be denied.

## I. BACKGROUND

I have drawn the facts from the allegations in the Verified Amended Complaint (the "Amended Complaint") and the exhibits attached to that pleading.[1] In resolving the motions to dismiss, I accept as true the Amended Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[2]

### A. The Parties and Relevant Non-Parties

Plaintiff, Western Standard, is a limited liability company based in Los Angeles, California and was, at the time of the Pangea-BancTec merger, a BancTec common stockholder.[3] In the merger agreement between Pangea and BancTec (the "Pangea-BancTec Agreement"), Western Standard is designated as the "Stockholder Representative," an exclusive agent authorized to assert claims under

---

[1] Verified Amended Compl. ("Am. Compl.") (D.I. 9).

[2] *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[3] Am. Compl. ¶ 2.

the agreement on behalf of the BancTec stockholders, including claims to enforce the earn-out provision.[4]

Defendant, Pangea, is a Delaware corporation that acquired BancTec in 2014.[5] Pangea later became a wholly owned subsidiary of SourceHOV, and is currently a subsidiary of Exela Technologies, Inc. ("Exela") following a transaction that will be described in more detail below.[6]

Defendant, SourceHOV, is a Delaware corporation that provides information and transaction processing services.[7] It was founded by non-party, Par Chadha, who previously controlled as much as 72.8–77.5% of SourceHOV's common stock.[8]

Non-party, HandsOnFund 4 I, LLC ("HOF4"), is an investment fund owned and controlled by Mr. Chadha.[9] Under the Pangea-BancTec Agreement, the earn-out provision is triggered if HOF4, as the controlling stockholder (designated in the

---

[4] *Id.*; Am. Compl., Ex. 1 ("Pangea-BancTec Agreement") § 8.1(a).

[5] Am. Compl. ¶ 3.

[6] *Id.*

[7] Am. Compl. ¶ 4.

[8] Am. Compl. ¶¶ 4, 7.

[9] Am. Compl. ¶¶ 6, 7.

4

Pangea-BancTec Agreement as the "Lead Investor"), realizes proceeds from a "Realization Event" "with respect to" its Pangea stock.[10]

## B. The Relevant Provisions of the Pangea-BancTec Agreement

BancTec and Pangea executed the Pangea-BancTec Agreement on February 21, 2014, whereby BancTec merged with and into a Pangea merger subsidiary and survived as a wholly owned subsidiary of Pangea Finance, Inc. ("Pangea Finance").[11] BancTec stockholders approved the transaction on March 31, 2014, and it closed on April 3, 2014.[12]

As consideration for the merger, BancTec common stockholders obtained the right to receive either Pangea stock or cash consideration as determined by a stated formula.[13] Regardless of their chosen form of consideration, BancTec common stockholders also received the right to $0.45 of "Per Share Contingent Consideration" if an "Earn-out Condition is satisfied."[14] Unlike a typical earn-out provision that is tied to defined performance milestones, this earn-out is tied to certain shares and certain designated events with respect to those shares.

---

[10] Am. Compl. ¶ 6; Pangea-BancTec Agreement at 1, § 2.14(a).

[11] Am. Compl. ¶ 14; Pangea-BancTec Agreement at 1.

[12] Am. Compl., Ex. 2, Appendix E at 41.

[13] Am. Compl. ¶ 15; Pangea-BancTec Agreement § 2.1.

[14] *Id*.

Specifically, Section 2.14(a) of the Pangea-BancTec Agreement appears to provide

that the Earn-out Condition is triggered when the Lead Investor realizes a designated

amount of proceeds in connection with a Realization Event:

> If at any time during the period commencing on the Closing Date and ending on the seven-year anniversary thereof (the "***Earn-out Period***") a Realization Event shall occur resulting in the realization by the Lead Investor with respect to the shares of Parent Class A common stock held by the Lead Investor as of immediately following the Closing of proceeds (net of expenses) greater than or equal to the number of shares of Parent Class A common stock held by the Lead Investor as of immediately following the Closing, multiplied by (i) with respect to any time on or prior to the five-year anniversary of the Closing Date, $2,000 (as adjusted for stock splits), and (ii) with respect to any time after the five-year anniversary and on or prior to the seven-year anniversary of the Closing Date, $3,000 (as adjusted for stock splits) (the "***Earn-out Condition***"), then the Per Share Merger Consideration shall be increased by an amount in cash per Common Share equal to $0.45 (the "***Per Share Contingent Consideration***").[15]

The definition of "Realization Event," in turn, includes three categories:

> (a) a dividend or other distribution with respect to the Parent Common Stock, or (b) the sale, transfer or exchange by the Lead Investor (other than to an Affiliate) of the Parent Common Stock, or (c) the pro rata distribution by the Lead Investor of the Parent Common Stock to its equity holders . . . .[16]

---

[15] Pangea-BancTec Agreement § 2.14(a).

[16] *Id.* at Annex I-11. "Parent Common Stock" is defined as "Class B common stock, par value $0.01 per share, of [Pangea]." *Id.* at Annex I-10. "Affiliate" is defined "with respect to a specified Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such first Person." *Id.* at Annex I-1.

At the closing of the Pangea-BancTec merger, HOF4 (the Lead Investor) held 35,100 Pangea shares.[17] According to Western Standard, if HOF4 or its affiliates participate in a transaction whereby they receive value equivalent to $70,200,000 (35,100 shares x $2,000) by February 21, 2019, then former BancTec stockholders must receive an additional $0.45 per share, or a total of $8,113,968.90 in earn-out consideration.[18]

The Pangea-BancTec Agreement lays out a procedure for Pangea to notify Western Standard if the earn-out obligation is triggered. If "(i) the Lead Investor ceases to own any shares of Parent Common Stock, (ii) . . . a Realization Event [occurs] pursuant to which the Earn-Out Condition is satisfied, or (iii) the final day of the Earn-out Period" occurs, Pangea must deliver to Western Standard "a statement (the "***Earn-out Statement***") setting forth the calculation of the net proceeds received by the Lead Investor in connection with any and all Realization

---

[17] Am. Compl. ¶ 28. The parties dispute the number of Lead Investor shares implicated by the earn-out provision. The Pangea-BancTec Agreement provides that HOF4 received 39,100 shares of Pangea Class A common stock under a concurrently executed agreement with Pangea and Pangea Finance (the "Contribution Agreement"). Pangea-BancTec Agreement at 1. But Plaintiff points to a presentation regarding the SourceHOV-Pangea merger that suggests HOF4 held 35,100 shares as of October 31, 2014. Am. Compl., Ex. 4, Ex. A ("Proposed Transaction Presentation") at 9. The resolution of this dispute is not necessary to decide these motions.

[18] BancTec common stockholders held 18,031,042 shares of stock at the time of the Pangea-BancTec merger. Am. Compl. ¶ 15.

7

Events[.]"[19]  "If the Contingent Consideration is, on the face of the Earn-out Statement, payable to the Stockholders," then Pangea must mail each stockholder its Per Share Contingent Consideration.[20]  Following the delivery of the Earn-out Statement, Pangea must provide Western Standard:

> with reasonable access to its, the Surviving Corporation's and the Lead Investor's books and records for the purposes of determining whether the Earn-out Condition has been satisfied and shall otherwise cooperate with any reasonable requests for financial information by the Stockholder Representative that is reasonably necessary for its review of the Earn-out Statement or any determination as to whether the Earn-out Condition has been satisfied.[21]

If Western Standard disputes the Earn-out Statement, it may request a review of the statement.[22]  And if Pangea and Western Standard cannot resolve their dispute after thirty days, they must seek the assistance of a mutually agreed upon "nationally recognized independent public accounting firm" who will make a binding determination.[23]

The Pangea-BancTec Agreement does not guarantee that the earn-out consideration will be paid.  Instead, as is typical in earn-out arrangements, Pangea

---

[19] Pangea-BancTec Agreement § 2.14(b).

[20] *Id.*

[21] *Id.* § 2.14(e)(i).

[22] *Id.*

[23] *Id.* § 2.14(e)(ii).

acknowledges its intent to pursue the business of Pangea and its subsidiaries with the goal of satisfying the Earn-Out Condition,[24] while BancTec and its stockholders agree that:

> (i) The Lead Investor, Parent, Merger Sub and their respective Affiliates retain the right in their sole discretion, for any reason or for no reason, not to engage in events constituting Realization Events, in which event no Per Share Contingent Consideration shall be payable, and (ii) the Lead Investor, Parent, Merger Sub and their respective Affiliates have no express or implied duty to pursue satisfaction of the Earn-out Condition or to conduct the business of the Surviving Corporation in a manner so as to cause the satisfaction of the Earn-out Condition.[25]

## C. Pangea Becomes a Wholly Owned Subsidiary of SourceHOV

On September 26, 2014, SourceHOV and Pangea executed a merger agreement (the "SourceHOV-Pangea Agreement") whereby SourceHOV and BancTec combined to become one of the largest transaction processing solution providers in the world.[26] To facilitate the transaction, SourceHOV created a merger subsidiary ("BTG") that merged into Pangea, with Pangea surviving as a subsidiary of SourceHOV.[27]

---

[24] *Id.* § 2.14(c).

[25] *Id.* § 2.14(d).

[26] Am. Compl., Ex. 2, Appendix A ("SourceHOV-Pangea Agreement"); Proposed Transaction Presentation at 3.

[27] Am. Compl. ¶ 24; SourceHOV-Pangea Agreement at 1, §§ 1.1(b), 1.5(b)(ii). The complete transaction involved two steps and two merger subsidiaries. In the "first merger," SHC Merger Sub, Inc. merged into Solaris Holding Corporation ("Solaris"),

Under Section 1.5(b) of the SourceHOV-Pangea Agreement, "each share of the common stock . . . of [BTG] then outstanding [was] exchanged for one validly issued share of common stock of [Pangea]," and "each share of Pangea Common Stock" was converted into the right to receive 1.0967 shares of SourceHOV common stock.[28]   HOF4 thus received 38,494 shares of SourceHOV common stock through the conversion of its 35,100 shares of Pangea common stock.[29]

Pangea emerged from the transaction looking very much as it did before the merger.  Its certificate of incorporation and bylaws remained unchanged and it continued to be controlled by the same stockholders.[30]

---

with Solaris emerging as the sole surviving entity.  SourceHOV-Pangea Agreement §§ 1.1, 1.5; Am. Compl., Ex. 3 ("Exela-SourceHOV Proxy") at F-37.  Solaris and SourceHOV then merged, resulting in the common stock of Solaris becoming the common stock of SourceHOV.  *Id.*  In the "second merger," BTG merged into Pangea and Pangea became a wholly owned subsidiary of SourceHOV.  *Id.*

[28] SourceHOV-Pangea Agreement § 1.5(b).

[29] Am. Compl. ¶ 28.

[30] Am. Compl. ¶¶ 24, 27; SourceHOV-Pangea Agreement § 1.4(b)(i) ("Upon consummation of the Second Merger: (i) The certificate of incorporation and bylaws of [Pangea] immediately prior to the Effective Time shall be the certificate of incorporation and bylaws of the [Pangea] immediately following the Effective Time"); Transmittal Aff. of Samuel J. Lieberman ("Lieberman Aff.") (D.I. 28), Ex. A (collecting Delaware State Certificates for Pangea and listing as most recent the Amended and Restated Certificate of Incorporation dated March 31, 2014); Exela-SourceHOV Proxy at F-38 ("Because Pangea was controlled by the same shareholders that now control [SourceHOV] at the date of the [Pangea-SourceHOV merger], the merger with Pangea was reflected at carrying value.").

**D. SourceHOV Becomes a Wholly Owned Subsidiary of Exela**

In July 2017, SourceHOV merged with and survived as a subsidiary of a special purpose acquisition company called Quinpario Acquisition Corp. 2, which then changed its name to Exela.[31] Prior to executing the merger, SourceHOV equity holders converted their interests into units of a wholly owned merger subsidiary of SourceHOV called Ex-Sigma LLC ("Ex-Sigma"), with SourceHOV surviving as a wholly owned subsidiary of Ex-Sigma.[32] As a result of the SourceHOV-Exela merger, former SourceHOV equity holders (or, more precisely, Ex-Sigma unit holders) received 80,600,000 shares of Exela stock.[33] The merger consideration was held by a subsidiary of Ex-Sigma, Ex-Sigma 2, LLC, and pledged to secure a loan used to complete the SourceHOV-Exela merger.[34]

On March 17, 2017, Western Standard wrote to counsel for SourceHOV to provide notice that the SourceHOV-Exela merger had triggered the earn-out provision.[35] Counsel for the Defendants replied four days later, explaining that "[a]s

---

[31] Am. Compl. ¶ 8; Exela-SourceHOV Proxy at 2. Exela's post-merger public filings identify Pangea and BancTec as subsidiaries of Exela as well. Am. Compl. ¶ 37; Am. Compl., Ex. 7, Form 10K/A Exhibit 21.1 at 1, 3.

[32] Exela-SourceHOV Proxy at 3.

[33] *Id.* at 2–3. The merger consideration was valued at $8.00 per share for a total of $664,800,000. Am. Compl. ¶ 45; Exela-SourceHOV Proxy at 54, 102.

[34] Exela-SourceHOV Proxy at 3.

[35] Am. Compl. ¶ 52.

a result of [the SourceHOV-Pangea merger], the obligation to pay the Contingent Consideration transferred with the Banctec [sic] Stock to SourceHOV Holdings, Inc. in the event of its disposal of BancTec."[36]  Counsel went on to explain that because BancTec remained a subsidiary of SourceHOV after SourceHOV's merger with Exela, a Realization Event had not occurred.[37]

On May 15, 2017, Western Standard suggested that the contractually mandated arbitration might be necessary and requested books and records from SourceHOV and HOF4 under section 2.14(e) of the Pangea-BancTec Agreement to determine whether the earn-out provision had been triggered.[38]  SourceHOV refused to comply and further stated that arbitration was inappropriate as the dispute between the parties involved the interpretation of the earn-out provision and whether it had been triggered, not the calculation of any earn-out consideration due and owing.[39]

### E. Procedural Posture

On March 13, 2018, Western Standard filed its Verified Complaint. On April 11, 2018, HOF4 and its affiliates sold seven million Exela shares in a

---

[36] Am. Compl. ¶ 53; Am. Compl., Ex. 8.

[37] *Id.*

[38] Am. Compl. ¶¶ 57, 62, 64.

[39] Am. Compl. ¶¶ 63–65.

public offering and received $35 million in proceeds.[40]  Western Standard filed its Amended Complaint on July 27, 2018, in which it alleges that the April 2018 public offering may be another Realization Event that would trigger the earn-out provision.

The Amended Complaint alleges two counts of breach of contract: Count I concerns Defendants' refusal to pay the earn-out consideration and Count II concerns Defendants' refusal to comply with the books and records and arbitration provisions relating to the earn-out obligation.  As relief, Plaintiff seeks direct damages of $8,113,968.90 for breach of the earn-out provision and at least $25,000 for legal fees and expenses in pursuing books and records and the bargained-for arbitration.  SourceHOV moved to dismiss the Amended Complaint on August 10, 2018, and Pangea moved to dismiss eleven days later.[41]

## II. ANALYSIS

Under Court of Chancery Rule 12(b)(6), dismissal is appropriate only where the Court determines "with reasonable certainty that the plaintiff would not be entitled to relief under any set of facts susceptible of proof."[42]  In considering a motion to dismiss, the Court accepts as true all well-pled allegations in the complaint

---

[40] Am. Compl. ¶¶ 68–69; Am. Compl., Ex.5.

[41] D.I. 13; D.I. 16.

[42] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010); *see also Gen. Motors*, 897 A.2d at 168 (holding that the court will deny a motion to dismiss "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances").

13

and draws all reasonable inferences from those facts in plaintiff's favor.[43]  But the Court need not "accept every strained interpretation of the allegations proposed by the plaintiff,"[44] nor must it "credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor."[45]

## A. The Pangea Shares Were Not Necessarily Extinguished in the Pangea-SourceHOV Merger

According to Defendants, because the earn-out right is tied to "the shares of Parent Class A common stock held by the Lead Investor as of immediately following the Closing[,]" there would be no need to engage in any contract construction if the Court determines that these earn-out shares no longer existed at the time of the alleged Realization Event (the SourceHOV-Exela merger).  And that is precisely what happened, Defendants argue, because the Lead Investor's Pangea shares ceased to exist in 2014 when they were converted into the right to receive stock in SourceHOV in the SourceHOV-Pangea merger.  This, of course, was years prior to the SourceHOV-Exela merger in 2017.

Although it is tempting to avoid untangling the knot that is Section 2.14(a) of the Pangea-BancTec Agreement, I cannot accept Defendants' argument that the

---

[43] *Id.*

[44] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[45] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

14

shares of a target entity (in this case Pangea) cease to exist, come what may, upon the consummation of a reverse triangular merger. In a typical two-party merger, two entities combine into one, with one entity disappearing and the other surviving.[46] The stock of the disappearing entity itself disappears by operation of law upon consummation of the transaction.[47] In a reverse triangular merger, however, the acquirer creates a subsidiary that merges into the target. The merger subsidiary (and its stock) disappear while the target (and its stock) survive as a subsidiary of the acquirer.[48] Thus, the effect of a reverse triangular merger "is the same as the purchase of . . . the outstanding stock" of the target.[49] Although stock of the target

---

[46] R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 9.5, at 9–12 (3rd ed. Supp. 2019) ("In the standard two-party merger, corporation A (acquiror) acquires corporation T (target) by merging T into A, which is the surviving corporation."); *Argenbright v. Phoenix Fin. Co.*, 187 A. 124, 126 (Del. Ch. 1936) ("When a consolidation or merger has taken place under the statute, the old corporations have their identity absorbed into that of the new corporation or the one into which they were merged.").

[47] *See, e.g.*, *Facchina v. Malley*, 2006 WL 2328228, at *2 (Del. Ch. Aug. 1, 2006) ("When the California Corporation merged into CCI . . . [the California Corporation] ceased to exist; there was no longer any stock; there were no shareholders; and the agreement lapsed.").

[48] *See* LOU R. KLING & EILEEN T. NUGENT, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS, § 1.02[4], I-9 (2018) ("Pursuant to [a reverse triangular merger], the outstanding shares of common stock of S [merger sub] would be converted into shares of common stock of T [target] and, as a result, T would become a (wholly owned) subsidiary of P [acquirer]."); BALOTTI, *supra* note 46, § 9.8, at 9–14 ("The advantage of this type of merger is that [target] will become a wholly-owned subsidiary of A without any change in its corporate existence.").

[49] KLING, *supra* note 48, at I-9; *see also Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A. 3d 62, 87–88 (Del. Ch. 2013) ("Both stock acquisitions and reverse triangular

15

may be converted into the right to receive stock in the acquirer (or cash or a combination of both),[50] the target's stock, by virtue of the deal's structure, does not disappear because it is through the target's stock that the acquirer wholly owns the target as a subsidiary.[51] That is the case here; Pangea merged into BTG and survived, unaffected, as a subsidiary of SourceHOV.[52] Accordingly, I cannot conclude on the

mergers involve changes in legal ownership, and the law should reflect parallel results."); Elaine D. Ziff, *The Effect of Corporate Acquisitions on the Target Company's License Rights*, 57 Bus. Law. 767, 788 (2002) ("A reverse subsidiary merger is arguably more analogous to a sale of stock than it is to a forward subsidiary merger where the target company disappears.").

[50] *See* BALOTTI, *supra* note 46, § 9.8, at 9–13 ("The shares of stock of [target] outstanding immediately before the effective time of the merger are converted into securities of the [the acquirer], cash or other consideration.").

[51] *But see Crown Books Corp. v. Bookstop, Inc.*, 1990 WL 26166, at *4 (Del Ch. Feb. 28, 1990) ("Bookstop itself was the corporation surviving, but the Bookstop stock owned by Crown was converted into the right to receive cash and no longer exists.").

[52] Defendants argue that "the pre-merger Pangea common stock was cancelled, and the stock of the SourceHOV subsidiary was exchanged for new Pangea common stock," but they fail to explain how or when the "new Pangea common stock" issued. Defs.' Opening Br. in Supp. of Their Mots. to Dismiss the Am. Compl. (D.I. 20) 10 n.4. Defendants do not identify any provision in the SourceHOV-Pangea Agreement authorizing new shares or any changes to Pangea's governing documents. Indeed, Pangea's certificate of incorporation, which authorizes 10,135,000 shares of Class A, B and C common stock, remained the same before and after the merger. *See* Am. Compl. ¶ 24; SourceHOV-Pangea Agreement § 1.4(b)(i); Lieberman Aff., Ex. A. Additionally, Defendants' October 31, 2014 Contribution Agreement acknowledges that SourceHOV held "all of the issued and outstanding capital stock of Pangea Acquisitions, Inc." after the SourceHOV-Pangea merger. *See* Lieberman Aff., Ex. B at 1.

pleadings that the Lead Investor's Pangea shares no longer existed in 2017 simply by virtue of the structure of the SourceHOV-Exela merger.[53]

## B. The Pangea-BancTec Agreement Is Ambiguous

To set the stage for the Court's attempt at contract construction, it is useful to recite again the disputed contract language. The earn-out right appears in Section 2.14(a) of the Pangea-BancTec Agreement entitled "Contingent Consideration":

> If at any time during the period commencing on the Closing Date and ending on the seven-year anniversary thereof (the "***Earn-out Period***") a Realization Event shall occur resulting in the realization by the Lead Investor with respect to the shares of Parent Class A common stock held by the Lead Investor as of immediately following the Closing of proceeds (net of expenses) greater than or equal to the number of shares of Parent Class A common stock held by the Lead Investor as of immediately following the Closing, multiplied by (i) with respect to any time on or prior to the five-year anniversary of the Closing Date, $2,000 (as adjusted for stock splits), and (ii) with respect to any time after the five-year anniversary and on or prior to the seven-year anniversary of the Closing Date, $3,000 (as adjusted for stock splits) (the "***Earn-out Condition***"), then the Per Share Merger Consideration shall be increased by an amount in cash per Common Share equal to $0.45 (the "***Per Share Contingent Consideration***").[54]

---

[53] The absence of properly considered evidence revealing the elimination of the Pangea stock stands in contrast to the facts pled in the Amended Complaint, considered as true on these motions where Western Standard clearly alleges that the Lead Investor Shares remained intact at the time of the alleged Realization Event. *See* Am. Compl. ¶¶ 24, 25.

[54] Pangea-BancTec Agreement § 2.14(a).

The definition of "Realization Event," in turn, identifies three instances where the earn-out right is triggered:

> (a) a dividend or other distribution with respect to the Parent Common Stock, or (b) the sale, transfer or exchange by the Lead Investor (other than to an Affiliate) of the Parent Common Stock, or (c) the pro rata distribution by the Lead Investor of the Parent Common Stock to its equity holders . . . .[55]

Defendants argue that to qualify as a Realization Event, a transaction must involve Pangea common stock changing hands in one of the ways designated in the definition of that term. By Defendants' lights, because Pangea remained in the control of SourceHOV after the SourceHOV-Exela merger, and the 2018 sale of Exela stock did not involve Pangea stock, neither event triggers the earn-out.[56] In addition, Defendants interpret the phrase "other than to an Affiliate" in the definition of Realization Event to exclude the SourceHOV-Exela merger because Exela was an affiliate of HOF4 at the moment SourceHOV merged with an Exela subsidiary.

Western Standard interprets Section 2.14(a) to require an earn-out payment even when an Affiliate of the Lead Investor engages in a Realization Event. In support of this construction, it points to Section 2.14(d) of the Pangea-BancTec

---

[55] *Id.* at Annex I-11.

[56] More specifically, Defendants argue that neither transaction falls under the definition of Realization Event because neither involved a "distribution, sale, transfer or exchange" of Pangea stock.

18

Agreement, which provides that "the Lead Investor, Parent, Merger Sub and their respective Affiliates retain the right . . . not to engage in events constituting Realization Events."[57] From this provision, Western Standard argues (by inverse logic) that the parties clearly understood that each of the actors listed in Section 2.14(d) could, in fact, "engage in events constituting Realization Events" as contemplated in Section 2.14(a). As for whether the Exela-SourceHOV merger falls within the definition of Realization Event, Western Standard argues that a "sale, transfer or exchange" of stock encompasses a merger like the one between SourceHOV and Exela.

Alternatively, Western Standard argues that the agreement is ambiguous. It urges the Court to follow other courts that have interpreted "with respect to," as used in Section 2.14(a), as "broad,"[58] "ambiguous" and "'cover[ing] related matters' beyond the language of an agreement."[59] Though it does not specify what matters

---

[57] *See* Pl.'s Answering Br. ("PAB") (D.I. 26) 19 (citing Pangea-BancTec Agreement § 2.14(d)).

[58] PAB 32 (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (interpreting an arbitration clause that referred to "differences arising with respect to the interpretation of this contract")); *Carder v. Carl M. Freeman Cmtys., LLC*, 2009 WL 106510, at *5 (Del. Ch. Jan. 5, 2009) (finding, in the context of an arbitration clause, little distinction between "all disputes arising in any way under the Agreement" and "any controversy arising with respect to this Agreement").

[59] PAB 32 (quoting *USG Cos. v. Advantage Sales & Mktg. LLC*, 2018 WL 3117545, at *8 (D. Del. June 25, 2018)).

should be "covered" here, Western Standard presumably reads the earn-out provision's use of "with respect to the shares" of Pangea common stock to encompass the Exela-SourceHOV merger even though the merger arguably involved SourceHOV stock, not Pangea stock.

Western Standard further argues that courts have construed the term "distribution," as used in the definition of Realization Event, to refer to both a "distribution of . . . shares"[60] and a "distribution of merger consideration."[61] Accordingly, it reads part (a) of the definition of Realization Event ("a dividend or distribution with respect to Pangea Common Stock") to include Exela's distribution of shares to Ex-Sigma and Ex-Sigma's distribution of shares to HOF4.

Finally, Western Standard points out that "Realization Event" refers only to "Parent Common Stock," which, in turn, is defined as "Class B common stock."[62] The earn-out provision, however, refers only to "Class A common stock," which is an undefined term.

---

[60] PAB 33 (quoting *Harriman v. E.I. du Pont De Nemours & Co.*, 411 F. Supp. 133, 163 (D. Del. 1975)).

[61] *Id.* (quoting *In re Appraisal of Dell Inc.*, 2015 WL 4313206, at *9 (Del. Ch. July 13, 2015), *as revised* (July 30, 2015)).

[62] Pangea-BancTec Agreement at Annex I-11, I-10.

That the parties do not agree on what these provisions mean does not render the provisions ambiguous.[63] But the ambiguity here does not arise from the parties' competing constructions of the disputed provisions. It arises, instead, from "obscured meaning" created by "indefiniteness of expression."[64] After reading the Pangea-BancTec Agreement more than a dozen times, I cannot discern the path by which the parties intended for the earn-out to be triggered and paid, and neither party has proffered a construction that makes sense of the operative provisions. Indeed, as discussed below, the provisions at issue raise more questions than answers.

The opening clause of the earn-out provision ("If at any time during [the Earn-out Period] a Realization Event shall occur") requires an application of the definition of Realization Event.[65] As stated, Realization Event includes:

> (a) a dividend or other **distribution with respect to the Parent Common Stock**, or (b) the sale, transfer or exchange **by the Lead Investor** (other than to an Affiliate) of the Parent Common Stock, or (c) the pro rata distribution **by the Lead Investor** of the Parent Common Stock to its equity holders . . . . [66]

---

[63] *Motorola, Inc. v. Amkor Tech., Inc.*, 849 A.2d 931, 936 (Del. 2004).

[64] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 784 (Del. 2012) (quoting *Motorola, Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008)); *see also Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *10 (Del. Ch. Aug. 23, 2010) ("When a motion to dismiss requires interpretation of a contract, the finding of an ambiguity will scuttle the defendant's chances of dismissing the plaintiff's claim, insofar as the defendant's motion relies on a specific interpretation of the contract.").

[65] Pangea-BancTec Agreement § 2.14(a).

[66] *Id.* at Annex at I-11 (emphasis supplied).

- Does the inclusion of the phrase "by the Lead Investor" in parts (b) and (c) and the "other than to an Affiliate" language in part (b), and the absence of that language in part (a), indicate that any entity can engage in a Realization Event by initiating a "dividend or distribution" (as provided in part (a))? Or is part (a) constrained, like the events described in parts (b) and (c), by a more specific meaning of "distribution"?

- What event qualifies as a "distribution *with respect to* the Parent Common Stock"? Am I to limit the interpretation of "distribution" to mean a distribution *of* the Parent Common Stock or does the use of "with respect to" encompass a distribution from another entity to the holders of the Parent Common Stock?

The definition of Realization Event refers to the definition of Parent Common Stock, which means "**the Class B common stock, par value $0.01 per share, of [Pangea]**."[67] With this definition in mind, one might reasonably conclude that each possible Realization Event must relate to Class B common stock. Yet the opening clause of the earn-out provision states: "If at any time during [the Earn-out Period] a Realization Event shall occur resulting in the realization by the Lead Investor with respect to the shares of **Parent Class A common stock** . . . ."[68]

- Assuming the parties to the agreement did not intend to render the earn-out provision meaningless from the outset,[69] am I to interpret the definition of Realization Event to refer to all outstanding common stock of Pangea even though the earn-out provision itself refers only to shares

---

[67] *Id.* at Annex at I-10 (emphasis supplied).

[68] *Id.* § 2.14(a) (emphasis supplied).

[69] *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'").

of Parent Class A common stock (which are not, by definition, Parent Common Stock)?[70]

- Or can a Realization Event occur "with respect to" Class B common stock that results in the Lead Investor realizing proceeds "with respect to" its Class A common stock?

- Or does the earn-out provision establish an additional Realization Event? In other words, should I read the provision to mean that a Realization Event shall be deemed to occur if the Lead Investor realizes proceeds "with respect to the shares of Parent Class A common stock"?

The remainder of the earn-out provision states, "If at any time during [the Earn-out Period] a Realization Event shall occur resulting in the realization by the Lead Investor **with respect to the shares of Parent Class A common stock held by the Lead Investor as of immediately following the Closing** of proceeds . . . ."[71]

- Can the Lead Investor realize proceeds only as a result of its possession of the shares, or does use of the phrase "with respect to" mean that the Lead Investor can realize proceeds indirectly as a result of its interest in an entity that owns the shares?

- In other words, does the phrase "with respect to" support direct realization, indirect realization or both?

- Does the phrase, "held by the Lead Investor as of immediately following the Closing" indicate that the earn-out is triggered only by a

---

[70] The earn-out is not the only provision that fails to square with the definition of Parent Common Stock. Section 4.3(b) regarding "Parent Capitalization" explains that the capital stock of Pangea includes Class A, B, and C shares, but "[t]he only shares of Parent Common Stock outstanding will be 39,100 shares of Parent's Class A common stock . . . ." Pangea-BancTec Agreement § 4.3(b).

[71] *Id.* § 2.14(a) (emphasis supplied).

Realization Event affecting the Parent Class A common stock when those shares are held by the Lead Investor?

Given the ambiguity surrounding the earn-out and related provisions, I cannot determine under what circumstances the earn-out is triggered and cannot, therefore, determine the viability of Western Standard's breach of contract claim "with respect to" the unpaid earn-out consideration.

## C. The Alleged Breach of the Books and Records and Arbitration Provisions and Dismissal of SourceHOV

As for Count II, Western Standard has adequately pled that Pangea has not provided an earn-out statement as required in Section 2.14(b) when "(i) the Lead Investor ceases to own any shares of Parent Common Stock, [or] (ii) . . . a Realization Event [occurs] pursuant to which the Earn-Out Condition is satisfied."[72] Under Section 2.14(e), Plaintiff's right to inspect books and records and to engage in an arbitration process depends upon its receiving an earn-out statement.[73] It is reasonably conceivable at this stage that an earn-out statement was required and that Defendants breached Section 2.14(e) by refusing to honor Plaintiff's inspection and arbitration rights. Therefore, the motions to dismiss Count II must be denied.

---

[72] *Id.* § 2.14(b).

[73] *See id.* § 2.14(e)(i) ("Following delivery of the Earn-out Statement, Parent shall provide the Stockholder Representative with reasonable access to its, the Surviving Corporation's and the Lead Investor's books and records . . . . If the Stockholder Representative disputes the Earn-out Statement, the Stockholder Representative shall have the right to request in writing, a review of the Earn-out Statement . . . .").

Finally, I decline to dismiss SourceHOV from the action at this time. Although SourceHOV is not a party to the Pangea-BancTec Agreement, Plaintiff has pled that "the obligation to pay the Contingent Consideration transferred . . . to SourceHOV Holdings, Inc."[74] That is enough at this stage to support a reasonable inference that SourceHOV has assumed, or at least shares, Pangea's alleged obligation to pay the earn-out.

## III.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are DENIED.  The parties shall confer and submit a case scheduling order within the next ten days.

**IT IS SO ORDERED.**

---

[74] Am. Compl. ¶ 35; Am. Compl., Ex. 8 at 1.